COUNTY OF LEAVENWORTH *v.* CHICAGO, R. I. & P. R. Co. and others.[1]

*(Circuit Court, W. D. Missouri.   1885.)*

1. RAILROAD COMPANIES—CONSOLIDATION—CHICAGO & SOUTHWESTERN RAILWAY COMPANY—MISSOURI STATUTE.

   The consolidation, on August 16, 1871, of the Chicago & Southwestern Railway Company and the Atchison Branch Company was valid, and the corporation thus formed succeeded to the rights, the property, and the obligations of the Chicago & Southwestern Company, created by the consolidation of September, 1869, and it is the proper party to represent all the interests of all the stockholders of which it was composed, including the county of Leavenworth as a stockholder

2. SAME—COMPLIANCE WITH ACT OF MARCH 24, 1870.

   Where the other essential provisions of the act authorizing railroad companies within the state of Missouri to consolidate are complied with, such consolidation will not be held void simply because there is no evidence that the companies each filed with the secretary of state a resolution accepting the provisions of the act passed by a majority of the stockholders, at a meeting called for the purpose of considering the same, or because there is no evidence of the meeting of the stockholders of the companies separately, except such as may be implied from the certified copy of the articles of agreement of the consolidation duly filed in the secretary's office.

3. SAME—FORECLOSURE AND SALE OF CHICAGO & SOUTHWESTERN RAILWAY—FRAUD—EVIDENCE.

   The foreclosure proceedings in the circuit court for the district of Iowa, and sale of the Chicago & Southwestern Railway Company, *held* valid.

In Equity.

*John F. Dillon, David Dudley Field, M. Kuetzner, Tenny, Flower & Cratty,* and *Flower, Reomy & Gregory,* for complainant.

*Thos. F. Witherow* and *Shanklin, Low & McDougal,* for defendants.

MILLER, Justice.   The county of Leavenworth, a municipal corporation of the state of Kansas, brings this bill in chancery against the Chicago, Rock Island & Pacific Railway Company, a corporation existing under the laws of the states of Illinois and Iowa, and against other corporations and persons interested in the matter in controversy.   There are in the case as submitted an original and amended bill, answers to these bills by the Rock Island Company, and replications; a large amount of testimony, consisting of records of other suits, documents, and transcripts of numerous papers, and many pages of depositions of witnesses; and the whole matter having been

[1] Reported by Robertson Howard, Esq., of the St. Paul bar.

very fully argued and considered, as far as I have time to do so, I proceed to give the views which, in my opinion, must govern the case. The history of the transactions out of which the controversy arises. may be stated as to its important elements as follows:

The Platte City & Fort Des Moines Railroad Company was a corporation organized and existing under a special charter granted by the legislature of the state of Missouri, approved January 4, 1860, for the purpose of constructing and operating a railroad, to commence at a point on the Missouri river opposite, or nearly opposite, the city of Leavenworth, Kansas, and run thence north-easterly to a point on the state line between Missouri and Iowa, in the direction of Fort Des Moines. The capital stock of this company was fixed by its charter at $3,000,000, of which Leavenworth county, on or about April 2, 1867, subscribed and paid for, at par, $300,000. The name of the company was afterwards lawfully changed to the Leavenworth & Des Moines Railway Company, and later to the Chicago & Southwestern Railway Company. Such changes, however, were merely of name, and without prejudice to the rights of stockholders in such original company. This company was also authorized by law to build a branch road from some point on the main line to a point on the north line of Missouri, in the direction of Ottumwa, Iowa. On or about the twelfth day of May, 1869, a corporation was duly formed under the general laws of Iowa, and called the Chicago & Southwestern Railway Company in Iowa, for the ostensible purpose of building and operating a railroad from Washington, in Iowa, south-westerly, to meet the road of said Chicago & Southwestern Railway Company, chartered in Missouri, at the state line between Iowa and Missouri. The capital stock of this Iowa corporation was fixed in the articles of incorporation at $3,000,000; and it was provided in said articles "that in the event of the consolidation of this corporation with the Chicago & Southwestern Railway in Missouri the company in which the two companies may be consolidated shall have the power to subject the said corporation to such amount of indebtedness or liability as the board of directors may deem necessary, not exceeding, however, six millions of dollars." On the twenty-fifth day of September, 1869, these two companies adopted articles of consolidation and became one company, under the name, the Chicago & Southwestern Railway Company, for the purpose of building a railroad from Washington, in the state of Iowa, to the Missouri river, in the state of Missouri, at a point nearly opposite to the city of Leavenworth, in the state of Kansas. In the proceedings which resulted in this act of consolidation the county of Leavenworth, as one of the stockholders in the Chicago & Southwestern Railway Company of Missouri, was represented by its duly-appointed agent, who gave his assent to the consolidation.

Although there are in both the original and amended bills some suggestions impeaching the validity of this consolidation, counsel for plaintiff, in the oral argument, made no such charge, and, as I un-

derstood, disclaimed such a proposition. On the first day of October, five days after this consolidation, the new company entered into a contract with the Chicago & Rock Island Railroad Company, whereby it agreed to issue its bonds to the amount of five millions of dollars, payable 30 years after date, bearing interest at the rate of 7 per cent. per annum, for which coupons were to be attached to the bonds; the whole to be secured by a mortgage on its line of road from Washington, in Iowa, to the Missouri river. In consideration that the proceeds of these bonds should be placed in the hands of the Rock Island Company, and certain advantages secured to that company by the contract, in the way of connection and running arrangement between the two companies and their roads, the Rock Island Company agreed to indorse these bonds, and out of the proceeds of their sale to pay the interest on all of them until the new road was constructed and turned over to the company.

In pursuance of this agreement the Southwestern Company issued its bonds to the amount of $5,000,000, and placed them in the possession of the Rock Island Company, and on the sixth day of October, 1869, made and delivered to defendants David Dows, Frederick S. Winston, and Calvin F. Burnes a deed of trust upon their entire line of road from Washington, in Iowa, to the Missouri river, to secure payment of these bonds and interest as agreed. The Rock Island Company indorsed the bonds, and sold them in open market, or paid them, with its guaranty on them, to the contractors who built the road. On the sixteenth day of August, 1871, articles of consolidation were signed between this Chicago & Southwestern Railway Company and another company organized under the laws of the state of Missouri by the name of the Atchison Branch of the Chicago & Southwestern Company, which was authorized to construct a road from a point on the east bank of the Missouri river opposite the city of Atchison, in the state of Kansas, to some point on the Chicago & Southwestern Railroad between Plattsburgh and Camden Point, in Missouri. These articles of consolidation were duly filed in the office of the secretary of state of the state of Missouri according to the law of that state; and it may be stated that, in all operations, contracts, and proceedings subsequent to that time, in which the Chicago & Southwestern Railway Company is spoken of, or takes part, it is this second consolidated company that is meant.

The validity of this consolidation is assailed by plaintiff on the ground that it is void by reason of its failure to conform to the laws of Missouri, and one of the principal issues raised in the case is on this proposition. The plaintiff in its prayer for relief asks that this supposed consolidation be declared null and void, and other important relief is founded on this asserted invalidity.

The road after several years was completed, and the money with which this was done was mainly raised by the sale of the bonds of the Southwestern Company, indorsed by the Rock Island Company,

and the Rock Island Company paid the interest on the bonds as it had assumed to do. The possession of the road as it became fit for use was taken by the Rock Island Company, so that when it was completed so as to be used from one end to the other, it was found in possession and use of that company, and so remained for two or three years afterwards. The Rock Island Company says in its answer that it paid the interest on the bonds out of the sale of the bonds themselves, according to the contract, until the road was finished, and after this it paid it out of its own money by reason of its obligation as guarantor or indorser of the bonds. After interest had thus accrued and been paid in this latter mode to the amount of a million of dollars, according to its statement, it made application to the trustees in the deed of trust for a foreclosure under the provisions of that deed on account of the default of the Southwestern Company in paying this interest. The trustees accordingly brought such a suit in the circuit court of the United States for the district of Iowa, where a decree was rendered, and a sale of the Southwestern road was made to a corporation organized under the laws of Iowa for the purchase of the road. Under this sale a deed was made to that company by the Chicago & Southwestern Railway Company by order of the court, and the deed and sale confirmed. To that suit of foreclosure the Chicago & Southwestern Railway Company and the Chicago, Rock Island & Pacific Railroad Company and others were made defendants, and the two companies appeared by counsel.

After the second consolidation, in which the Atchison Branch came into the Southwestern Company, that company issued bonds to raise money for the construction of this Atchison Branch, and a mortgage or deed of trust was made to secure the payment of these bonds, which was a first mortgage on the Atchison Branch, and a second mortgage on the remainder of the consolidated company's road. The trustees in this mortgage were made defendants in the foreclosure suit, and the holders of the bonds so secured were afterwards, on motion, admitted to defend for their interest in the suit. After the sale of the road under the decree and its purchase by the new organization, which was called the Iowa Southern & Missouri Northern Railroad Company, that company entered into a consolidation with the Chicago, Rock Island & Pacific, which consolidation included other roads or pieces of roads built under the auspices of the Rock Island Company, all of which were now consolidated under the name of the Chicago, Rock Island & Pacific Railway Company, which is the principal defendant in this suit.

This suit of the county of Leavenworth is founded on the proposition that the attempted consolidation of the Chicago & Southwestern Company with the Atchison Branch Company is utterly void, and as the real Southwestern Company, which issued the bonds and made the mortgage on which the foreclosure suit and sale was based, was never served with process or appeared in that suit, this decree and fore-

closure sale are also void.    As the real Southwestern Company, which gave this mortgage, refuses to take any steps to assert its rights, the county of Leavenworth, as one of its stockholders, comes forward on behalf of itself and other stockholders to do so, and prays that the decree and sale under the proceedings in the Iowa circuit court be set aside and held for naught, as well as the pretended second consolidation.    Should this second consolidation be held valid, then it asks that the sale of the road under that decree and the decree itself be set aside and held for naught, on the ground of fraud and abuse of trust by the Rock Island Company, for reasons which will be more particularly stated hereafter.

It will thus be seen that the first question to be decided by the court is whether the second consolidation, namely, that with the Atchison Branch Company, is void; so void that no such company as this second consolidated company had or has an existence which made it capable of doing any business whatever, and especially of sustaining as a defendant in a court of justice the suit to foreclose the mortgage given by the first consolidated company; for it is obvious that if this second consolidated company was not the legal owner of the Chicago & Southwestern Railroad, and was not liable for the bonds and mortgage, then no company was before the court which foreclosed that mortgage which had any interest in the road, or was under any obligation to defend the suit.    As we have already stated that the first consolidated company was not before that court at all, nor represented in the proceedings, except as it was a part of the second consolidated company, it would therefore follow that the foreclosure proceedings are void as to the real Chicago & Southwestern Company; the sale of its road is void, and the consolidation with the Chicago & Rock Island, as transferring the ownership of that road, is ineffectual; and the real Southwestern Company, under the first consolidation, is still in existence, is the legal owner of the road, and has a right to pay the overdue interest on its bonds, and to take possession of it.

The question here presented must be decided by a reference to the laws of the state of Missouri authorizing such consolidation.    There were two statutes in existence in Missouri authorizing the consolidation of railroad companies on the eleventh day of August, 1871, when this consolidation was attempted.    The first of these was approved March 2, 1869, and is found in the Session Laws of the legislature of that year, page 75.    This statute provides for consolidation between corporations, one of which is organized under another state and one under the state of Missouri, whose respective roads meet and connect at the boundary line of those states.    The consolidation in question was not made under this law, because both companies were Missouri corporations, and the roads united within the limits of that state. Another statute, however, approved March 24, 1870, (Laws Twenty-fifth Assembly, Adjourned Session, p. 89,) authorized railroad companies in the state owning railroads constructed wholly or in part to

consolidate. And it is under this statute that the consolidation in question was attempted. And as the validity of this attempted consolidation must be determined by a careful consideration of this statute in connection with what was done under it, the first section of it, which is all that relates to this subject, is here copied *verbatim:*

"Section 1. Any two or more railroad companies in this state, existing under either general or special laws, and owning railroads constructed wholly or in part, which, when completed and connected, will form, in the whole or in the main, one continuous line of railroad, are hereby authorized to consolidate, in the whole or in the main, and form one company, owning and controlling such continuous line of road, with all the powers, rights, privileges, and immunities, and subject to all the obligations and liabilities to the state, or otherwise, which belonged to or rested upon either of the companies making such consolidation. In order to accomplish such consolidation, the companies interested may enter into contract, fixing the terms and conditions thereof, which shall first be ratified and approved by a majority in interest of all the stock held in each company or road proposing to consolidate, at a meeting of the stockholders regularly called for the purpose, or by the approval, in writing, of the persons or parties holding and representing a majority of such stock. A certified copy of such articles of agreement, with the corporate name to be assumed by the new company, shall be filed with the secretary of state, when the consolidation shall be considered duly consummated, and a certified copy from the office of the secretary of state shall be deemed conclusive evidence thereof. The board of directors of the several companies may then proceed to carry out such contract according to its provisions, calling in the certificates of stock then outstanding in the several companies or roads, and issuing certificates of stock in the new consolidated company under such corporate name as may have been adopted: provided, however, that the foregoing provisions of this section shall not be construed to authorize the consolidation of any railroad companies or roads, except when by such consolidation a continuous line of road is secured, running in the whole or in the main in the same general direction; and provided it shall not be lawful for said roads to consolidate, in the whole or in part, when by so doing it will deprive the public of the benefit of competition between said roads. And in case any such railroad companies shall consolidate or attempt to consolidate their roads contrary to the provisions of this act, such consolidation shall be void, and any person or party aggrieved, whether stockholders or not, may bring action against them in the circuit court of any county through which said road may pass, which court shall have jurisdiction in the case, and power to restrain by injunction or otherwise. And in case any railroad in this state shall hereafter intersect any such consolidated road, said road or roads shall have the right to run their freight cars without breaking bulk upon said consolidated road, and such consolidated roads shall transact the business of said intersecting or connecting road or roads on fair and reasonable terms, and the same may be enforced by appropriate legislation. Before any railroad companies shall consolidate their roads under the provisions of this act, they shall each file with the secretary of state a resolution accepting the provisions thereof, to be signed by their respective presidents, and attested by their respective secretaries, under the seal of their respective companies, which resolution shall have been passed by a majority vote of the stock of each at a meeting of the stockholders thereof to be called for the purpose of considering the same."

A certified copy of the articles of agreement under which the consolidation was effected, with the corporate name of the new company,

was duly filed with the secretary of state as this law requires. But there is no evidence in this record of the filing with the secretary of state, by each of the companies so consolidated, of a resolution accepting the provisions of the act passed by a majority of the stockholders at a meeting of stockholders called for the purpose of considering the same, nor is there any evidence of such meeting of the stockholders of the companies separately, except such as may be implied from the certified copy of the articles of agreement of consolidation duly filed in the secretary's office.

Is the absence of any evidence of these meetings, and of the passage of the resolutions to accept the provisions of the act by the respective companies, fatal to the creation of the new consolidated company, when all other requirements of the statute shall have been complied with? It will be observed that this is the last provision in the statute, though the thing ordered to be done is one of the first steps required in the process. It is also a provision which may well be held to be directory, and designed to secure evidence that each of the companies intending to consolidate recognized the statute as the sole authority for such consolidation, and their obligation to be governed by its provisions. If the other essential provisions of the act were complied with, it does not necessarily follow that the whole proceeding would be void for a failure to comply with this direction of the act.

It is argued, however, that by the express language of the statute it is declared that "in case any such railroad companies shall consolidate, or attempt to consolidate, their roads contrary to the provisions of this act, such consolidation shall be void; and any person or party aggrieved, whether stockholder or not, may bring action against them in the circuit court of any county through which such road may pass, which court shall have jurisdiction in the case, and power to restrain by injunction or otherwise." This sentence does not come after but before the provision concerning the resolutions accepting the law under which consolidation is made. In the orderly succession of ideas, this concerning accepting the provisions of the statute was not in the mind of the draughtsman when the provision making the consolidation void was penned. On the other hand, the limitation that the companies which are authorized to consolidate are only those whose roads when united "will form in the whole or in the main one continuous line of road," and that this authority "shall not be construed to authorize the consolidation of any railroad companies or roads except when, by such consolidation, a continuous line of road is secured, running in the whole or in the main in the same general direction,   *   *   *   and it shall not be lawful for said roads to consolidate, in the whole or in part, when by so doing it will deprive the public of the benefit of competition between such roads,"—immediately precedes the declaration that any attempt to consolidate contrary to the provisions of the act shall be void. It is

v.25F,no.5—15

the consolidation of such roads as do not form when so consolidated one continuous line, but may be made up of parallel and competing lines, which is forbidden and declared to be void.

The language of the remedy prescribed by the statute indicates that it is for the violation of this principle that it is given. The court of the county in which the road lies, or through which it passes, not that where the company has its organization or offices, shall have jurisdiction, and the remedy shall be to restrain the company by injunction or otherwise. It is the continuity or parallelism of the roads, the benefit of competition by roads between the same points, which is to be secured. And it is clear that the legislature was not so much interested about the companies, and their amalgamation into one company, as they were that rival roads and competing roads should not be consolidated and brought under the same control. I doubt very much whether the legislature intended to declare that even for a violation of this principle, much less of any of the other mere details of the mode of accomplishing a consolidation, it should be absolutely void,—void *ab initio*, void everywhere and under all circumstances,—but only as the word "void" is so often used in legislation, and in written agreements, that it should be voidable. That if on investigation the roads were of that character which the statute forbade to be consolidated, the proper court could so declare, and annul and avoid the consolidation. This is the more reasonable, as the parallelism or competing character of the two roads, if it were disputed, could only be satisfactorily ascertained by a judicial investigation, and it could not be permitted that any man who wished to do so could assume for himself that the consolidation was void, and act accordingly. Without the aid of the statute, if the legislature, or the governor, or the attorney general of the state believed the roads were not such as the law permitted to be consolidated, they could, by the institution of proper proceeding in a court of justice, have the act of consolidation annulled, if they were correct in their views. This statute confers the right on any person aggrieved by such improper consolidation to have relief by application to the proper court, which would not otherwise exist.

In regard to the acceptance of the provisions of the consolidation act, to be filed with the secretary of state, this is eminently a matter between the state and the corporations whose rights are affected, and if, on a failure to file such acceptance, the consolidation is to become void, it is the privilege of the state to enforce the forfeiture or annulment, and not of every private person who shows no injustice or injury done to himself. But, if this were more doubtful than it is, it appears to me that the proposition here insisted on is concluded by this language of the act:

"A certified copy of such articles of agreement, (for consolidation,) with the corporate name to be assumed by the new company, shall be filed with the secretary of state, when the consolidation shall be considered duly consum-

mated, and a certified copy from the office of the secretary of state shall be deemed conclusive evidence thereof."

This certified copy from the secretary's office is to be evidence of something. Let us consider what, and its effect as evidence. (1) Of what is it to be a copy? Of the articles of agreement for consolidation made by the companies to be consolidated, not of all the requirements of the statute, preliminary or otherwise. (2) What shall it prove? That thereafter the consolidation shall be considered duly consummated. There is no ambiguity in this. It shall be evidence that the consolidation has been perfected, and has resulted in the creation of a new corporation, whose name is to be found in this certified copy. (3) What is the effect of this evidence? The statute says it shall be *conclusive.* It is not necessary here to hold that in a direct proceeding on the part of the state to have a declaration of the nullity of such a consolidation, no evidence can be received to impeach the validity of the original act of consolidation. It is my opinion that in such case the certified copy from the secretary's office would not be conclusive but *prima facie* evidence.

But what is meant, and what is reasonable, is that when a corporation so organized comes into a court of justice, either as plaintiff or defendant, in a contest with individuals or other corporations in regard to any matter affecting its rights, its powers, its authority to make contracts, to sue or to be sued, the production of the paper mentioned shall end all inquiry into its existence as a corporation, with such powers as the law confers on it. It would be burdensome in the extreme, a hardship altogether unnecessary to any proper purpose, to require of a corporation doing an immense business to prove, in every controversy it may have growing out of that business, that all the steps which the law directs for the consolidation proceedings have been strictly complied with. The hardship would be as great on those who sue it for violated duty of contract, or otherwise, to be required to prove in the same manner the existence of the corporation which they bring into court.

The question of the existence of this corporation arises incidentally in this effort of the county of Leavenworth to assert the rights of another company, and though the bill prays that the consolidation be held void, it is not the state which makes this request, or institutes or controls this proceeding, nor is the proceeding itself of the character of a direct suit for the purpose of procuring such a decree, which would bind the company in any other case. I am of opinion that the consolidation of August, 1871, was valid, and that the corporation thus formed succeeded to the rights, the property, and the obligations of the Chicago & Southwestern Company, created by the consolidation of September, 1869, and that it was the proper party to be sued, and to represent all the interests of all the stockholders in all the corporations of which it was composed, including the county of Leavenworth as one of these stockholders.

Approaching, now, the question of the validity of the proceedings in the circuit court of the United States for the district of Iowa, under which the road of the Southwestern Company was sold, and afterwards became part of the new system of consolidated railroads held by the new corporation, called the Chicago, Rock Island & Pacific Railway Company, the matter is much simplified by the fact that that court had jurisdiction of the case,—jurisdiction of the parties plaintiff and defendant,—of all the necessary parties to the relief sought, and of the subject-matter of the suit. For any mere error of that court in its decision on matters of law or fact the proper remedy was by appeal, and one of the parties did, as to its own interest, take such appeal to the supreme court of the United States, which affirmed the decree. Another remedy was by bill of review, asking the same court to reconsider and reverse or modify its decree on the same or on newly-discovered evidence. This course has not been adopted, and it admits of very serious doubt whether any proceeding can be sustained in any other court, the purpose of which is to set aside the decree of that court in the matter of which it had jurisdiction. I know of no reason why the suit to have a decree declaring null and void the foreclosure proceedings of that court by reason of any fraud in its procurement, whether it be legal fraud implied from the relations of the parties, or actual fraud practiced in the progress of the case, should not have been brought in the court where these proceedings were had.

Conceding, however, the jurisdiction or this court—the circuit court for the Western district of Missouri—to grant some form of relief inconsistent with the binding efficacy of the decrees of the circuit court for the district of Iowa, let us inquire on what grounds the efficacy of those decrees is denied. Although in the more enlarged use of the word it may be said the grounds are all founded on fraud, they present in reality two distinct propositions, namely:

(1) That such were the relations of the trustees in the mortgage to the Chicago, Rock Island & Pacific Company, at whose instance the mortgage was foreclosed, and the relations of those trustees and the governing officers of the Rock Island Company to the debtor, the Southwestern Company, and the relations of the officers of both these companies to each other, and to both of their companies, that there could be no just and rightful foreclosure as between these parties, and that the action of the trustees in the mortgage deed, and of the Rock Island Company, as moved by its officers in promoting the foreclosure, was a violation of the trust reposed in all these parties, for the breach of which the whole proceeding must be held void.

It must be admitted that the case made is a very strong one. One of the trustees of the mortgage deed was a director in the Rock Island Company; both the others were stockholders in it. The president of the Rock Island Company was president of the Southwestern Company. A majority of the directors of the Southwestern Company were

directors in the Rock Island Company. There was in the hands of the president of the Rock Island Company a majority of the stock of the Southwestern Company. The attorney who appeared and represented the Southwestern Company had been previously in the employ of the Rock Island Company, and the attorneys who brought the foreclosure suit in the name of the trustees were afterwards in many matters attorneys for the Rock Island Company, and one of the attorneys of the Rock Island Company in the foreclosure suit was at the time a director in the Southwestern Company. These facts do not look well on their face, and if there is any evidence of any actual fraud committed in the progress of the case, they are persuasive as showing how easily it could have been made successful.

As evidence standing alone of such legal fraud, or such violation of trust as will render the whole proceeding void, let us look into them in detail. As regards the attorneys, it can hardly be admitted as an impeachment of the attorney of the defendant the Southwestern Company that he had been or was afterwards an attorney of the Rock Island Company, nor will it be presumed that if he was then in the employment of the Rock Island Company in other matters, that he did not or would not faithfully represent the Southwestern Company in this matter; and his character repels any such inference. Nor does the fact that the attorney of the Rock Island Company was a director in the Southwestern Company, though the interest of the two companies might conflict, preclude him from acting as attorney for the former company. And we see no reason why the men then and afterwards attorneys for the Rock Island Company should not represent the trustees in the mortgage, as there was no conflict of interest between the trustees and the Rock Island Company.

In reference to the relations of the officers of the two companies to those companies and to each other, it is quite apparent that from the consolidation of the Iowa and the Missouri companies on the twenty-fifth of September, 1869, and the contract between the consolidated company and the Rock Island on the first day of October, that the purpose of the Rock Island Company, or of those who had its control, was to secure and retain a paramount influence in the directory of the Chicago & Southwestern. And in point of fact it cannot be doubted that it did obtain and exercise at times such control. While it is not necessary to consider that the purpose of this control was to injure the Southwestern Company, but in the view of all the parties it was to advance the interest of both companies, it is certainly true that the primary object in the minds of those controlling the Rock Island Company was to make the other road a subsidiary and feeding road to its own line. This purpose was not necessarily a bad one, and was or might have been consistent with the best interests of both companies. The Rock Island Company paid a valuable consideration for this control, and the other company received it. It indorsed the bonds of the Southwestern Company to the amount of

$5,000,000, and agreed to protect it against a foreclosure of the mortgage given to secure the payment of these bonds during the period of construction of the road. The burden of this obligation, and its importance to the success of the undeveloped enterprise of the new company, cannot be easily overrated. The road could not have been built without it. The money for the construction of the track and laying it with iron came almost exclusively from the sale of these bonds, and that the money was raised on them was due, not to the credit of the Southwestern Company or to the mortgage on a road barely begun, but to the indorsement of the Rock Island Company, and the credit which that indorsement gave to the bonds. This credit and assumption of liability by the Rock Island Company enabled the Southwestern Company to build its road to completion. There was nothing, therefore, fraudulent or oppressive in that company's seeking to retain such control of the road as would enable it to realize the consideration for which it assumed this obligation of $5,000,000. Matters were in this condition when the road was completed; but the Southwestern Company had no means of equipping its road with rolling stock and meeting other necessary outlays. The Rock Island Company furnished this, and used the road under an arrangement for lease, never, perhaps, fully consummated.

But at the end of two or three years, in which it kept an account of receipts and expenditures, it was found that the Southwestern Company was indebted over a million of dollars for repairs and construction of the road, and had defaulted in payment of the interest on its bonds to an amount nearly equal, the coupons for which had been paid by the Rock Island Company as indorser, and were held by it. That company determined then to assert the right which its contract gave to have the mortgage foreclosed to satisfy the interest which it had paid on the bonds it had indorsed. Unless there was some injustice in the manner in which it had managed the road or kept its accounts, I see no defect in its right to insist on the foreclosure. If the Rock Island Company had a right to insist on this foreclosure, it was the duty of the trustees in the deed of trust to bring the suit for that purpose. I am unable to see anything in the fact that some of the same men were found to be trustees in this deed, and directors in the Rock Island Company, and that directors in the Southwestern Company were also directors in the Rock Island Company, which should block the course of justice, paralyze the power of the court, and deprive the creditor corporation of all remedy for the enforcement of its lien. If it could be shown that the Southwestern Company did not owe this interest, or that the Rock Island Company had in its hands the means of the Southwestern Company to meet this obligation, and that by reason of collusion between those who controlled both companies this fact was suppressed or concealed, it would present a strong case for relief. But this would be actual fraud, and one not necessarily growing out of the influence of the Rock Island direct-

ory over that of the Southwestern. Notwithstanding the commingling of officers, the corporations were distinct corporations. They had a right to make contracts with each other in their corporate capacities, and they could sue and be sued by each other in regard to those contracts; and the question is not, could they do these things, but have the relations of the parties—the trust relation, if indeed such existed—been abused to the serious injury of the Southwestern Company?

In regard to the legal right of the Rock Island Company to have the mortgage foreclosed in satisfaction of the sum paid by it for interest after the completion of the road, it seems to me there can be no reasonable doubt.

(2) We next proceed to inquire if there was any actual fraud perpetrated in the progress of the case to the prejudice of this plaintiff, the county of Leavenworth. The principal ground of complaint under this head is that the Rock Island Company, being in actual possession and use of the road on which the mortgage was a lien, should have used its revenue first to pay the interest, and have postponed the repairs and construction to that purpose. The proper place to have made this defense was in the foreclosure suit. Though it may be said that the Southwestern Company made no such defense because it was in the control of the Rock Island directory, which is plausible, if not sound, it is to be observed that this suit was in the court for more than a year; that it is hardly possible that the authorities of the county of Leavenworth did not know of its pendency, and who were the directors in its own company; and if it had at any time appeared in that court and sought to make the defense it now sets up, it would have been permitted to do so.

Such defense, including also the correctness of the accounts of the Rock Island Company, was made by a Mr. Mueller, representative of the bondholders of the second mortgage made to obtain money to build the Atchison Branch. On his motion he was made defendant and permitted to file a cross-bill. The claim of the Rock Island Company for the interest paid by it as indorser, its claim for expenditures in repairs and construction, and the correctness of its accounts and its appropriation of the receipts from the Southwestern road, were all assailed by him in a cross-bill, and referred to a master, before whom his counsel appeared, and to whose report he excepted. This report was confirmed, and became the basis of the decree as to the amount due the Rock Island Company under the mortgage, and of a personal judgment for repairs and construction. From this decree Mueller took an appeal to the supreme court of the United States, where the decree was affirmed.

But I must add that even now, after all the proofs taken in the present case, I do not see that if the county of Leavenworth had been a party to that suit, or if the counsel for the Southwestern Company had been ever so anxious to prevent a foreclosure, what defense could

have been successfully presented, or how he could have diminished the amount which the court found to be due from that company on the mortgage. The case is one not uncommon of a road completed, which, in its first years, did not earn enough money to pay its running expenses, its necessary repairs, and the interest on its bonded debt. Such roads have often been sold out under foreclosure proceedings, and, passing into other hands, have become successful and profitable enterprises. The original owners see then, when it is too late, that they permitted a valuable property to pass from them which they would gladly reclaim. But courts of equity do not sit to restore opportunities or renew possibilities which have been permitted to pass by the neglect, the ignorance, or even the want of means of those to whom they were once presented.

It follows from these views, without reference to many other matters presented for consideration, that the plaintiff is not entitled to the relief it asks, or to any relief founded on this bill. It must therefore be dismissed; and it is so ordered.