[Crim. No. 2176.  In Bank.—August 25, 1919.]

THE  PEOPLE,  Respondent,  v.  ANTONE  LAPARA,
Appellant.

[1] CRIMINAL LAW—RELIANCE FOR CONVICTION UPON DIRECT EVIDENCE—
INSTRUCTION—LAW OF CIRCUMSTANTIAL EVIDENCE.—In a criminal
case in which the prosecution relies for conviction upon direct evi-
dence, the circumstantial evidence, if any, being merely incidental
to and corroborative of the direct evidence, an instruction on the
law of circumstantial evidence need not be given, and in such
case it should not be intimated to the jury that the case of the
people is one of circumstantial evidence.

[2] ID.—ARGUMENT TO JURY—LAW OF CIRCUMSTANTIAL EVIDENCE—
PROPER REFUSAL.—In a criminal case where the prosecution relies
for conviction upon direct evidence and the circumstantial evidence
developed in the case is in fact merely incidental to and corrobo-
rative of the direct evidence, the trial court may well refuse to allow
counsel for defendant to argue the law of circumstantial evidence
to the jury.

[3] ID. — MURDER — EVIDENCE — ACCUSATORY STATEMENT — DENIAL BY
DEFENDANT—ERRONEOUS ADMISSION.—In a prosecution for murder,
it was error to admit and error to refuse to strike out after its
admission a conversation between the defendant and a police de-
tective wherein the defendant was accused of the crime and denied
the accusation.

[4] ID.—EVIDENCE—ADMISSIBILITY OF ACCUSATORY STATEMENTS.—Or-
dinarily, when a defendant, under conditions which fairly afford
him an opportunity to reply, stands mute in the face of an ac-
cusation of crime, the circumstance of his silence may be taken
against him as evidence indicating an admission of guilt, but if
he promptly and fully deny the charge, the accusatory statements,
standing alone, are not in any sense competent evidence of the
defendant's guilt and should in such a contingency be excluded
from the consideration of the jury.

[5] ID.—VERDICT OF MURDER IN SECOND DEGREE—EVIDENCE—REFUSAL
OF INSTRUCTION NOT ERRONEOUS.—In a prosecution for murder
it was not error to refuse to instruct the jury that if they should
find that the defendant did shoot and kill the deceased, but should
entertain a reasonable doubt as to whether the defendant was
guilty of murder in the first or second degree, they should find him
guilty of the lesser degree, where the evidence showed that the man
who did the killing was guilty of murder in the first degree and
the defense interposed solely that of mistaken identity.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco.    Frank H. Dunne, Judge. Affirmed.

The facts are stated in the opinion of the court.

Nathan C. Coghlan for Appellant.

U. S. Webb, Attorney-General, John H. Riordan, Deputy Attorney-General, James M. Brennan and J. J. West for Respondent.

LENNON, J.—Antone Lapara, the defendant herein, was charged with the crime of murder.    He was convicted of murder in the first degree.    This appeal is from a judgment of the superior court of the city and county of San Francisco imposing a death sentence as the penalty for the crime.

The principal points presented in support of the appeal involve the correctness and consequences of a ruling of the trial court concerning the admissibility of certain evidence and the refusal of the trial court to permit counsel for the defendant to argue the case to the jury upon the theory that it was one of circumstantial evidence.    The evidence adduced upon the whole case, in so far as it is pertinent to the points presented, may be epitomized as follows: On the morning of the twenty-eighth day of November, 1917, one Mario Alioto was shot and killed while riding in an automobile truck which he was driving on Columbus Avenue, in the city of San Francisco.    The murderer fired the fatal shot while standing on the running-board of the truck, and then fled.    The defendant was identified as the slayer of Alioto by the direct testimony of two witnesses.    Witness Root, a special police officer, testified for the people that he was standing on a street corner near the scene of the murder when his attention was arrested by the sound of a shot.    Looking along Columbus Avenue, he noted a man, whose face he did not see but whom he identified as the defendant, standing on the truck by Alioto.    He testified that he saw this man fire two shots into the body of the deceased and then run.    Root gave chase, twice losing sight of the defendant momentarily, but never being more than 135 feet distant from him, and captured the defendant on Stockton Street and took him to the Hall of

Justice. Witness Drolet testified that at the time of the shooting she was standing on Columbus Avenue with her friend, Mrs. Leonardine, waiting for a street-car at a point about forty feet ahead of the truck. She saw a man, whom she identified as the defendant, mount the truck. Shortly after this, her attention was again directed to the truck by the sound of the explosions caused by the firing of the shots. She then observed the murderer leaping from the truck, and, at that moment, she obtained a view of his face which she said was that of the defendant. Mrs. Leonardine testified as a witness for the people that she was unable to identify the defendant as the man who shot Alioto because she had only seen the back of the murderer. The defendant was also recognized and identified by the witness Emmons as the man who fled from the scene of the crime. Honorable John J. Sullivan, police judge of the city and county of San Francisco, as a witness for the people, testified to a conversation occurring in the Hall of Justice with Special Officer Root, the defendant being present and in the custody of Root, wherein Root, in response to an inquiry as to why he had the defendant in custody, said that he, the defendant, had "shot somebody on Columbus Avenue," and that thereupon the defendant said, "Did you see me shoot him?" Root replied, "Yes, I did, and I have you here." Whereupon, the defendant "in somewhat of an indifferent manner shook his head but did not make any reply." Two firemen, Baldwin and Shay, testified to having observed the pursuit of the defendant. Baldwin joined in the chase, and, when he came up with the defendant, the latter was breathing heavily and said, "It's all over now," or something to that effect. It was shown by the witness Cuneo that three shots were fired and that the assassin, whom she saw running, threw away some object in the course of his flight. By witness Zecker it was shown that a revolver with three empty shells was found at the place indicated by the witness Cuneo.

It will be noted that only one man was observed running from the scene of the murder. In this particular, the testimony of eye-witnesses is agreed, although they differ in the details of their description of the clothing worn by the fleeing man. Some witnesses swore that the man running had a coat on. Other witnesses, one in particular who was standing within a few feet of the fleeing man, testified that he wore

a cap but no coat.   Other witnesses were positive that the
fleeing man had on neither cap nor coat.   At the time of his
arrest on Stockton Street, between Chestnut and Lombard,
within a few blocks of the scene of the murder and very
shortly thereafter, the defendant was wearing a coat and a
cap.   Two witnesses for the defense, who saw the murderer
in full flight, swore that they knew the defendant, and that
they glimpsed the face of the murderer as he ran, and that
he was not Antone Lapara, the defendant.   Testifying in his
own behalf, the defendant denied that he did the killing or
that he was, at any time during the day of the killing, at the
scene of the killing.   Other witnesses for the defendant gave
testimony intended to, if not tending to, support the testi-
mony of the defendant.   The eight year old daughter of the
defendant, after qualifying as a witness, testified that while
near the scene of the killing on her way home from school
she saw one of two men on an automobile shooting and then
saw one of these men run down Columbus Avenue and that
the man was not her father.

An analysis of the evidence thus outlined demonstrates that
the prosecution relied primarily for a conviction upon direct
evidence, and that whatever circumstantial evidence appears
in the case was developed incidentally and for the purpose
of corroborating the direct evidence.   Witnesses Root and
Drolet did not undertake to identify the defendant by means
of his clothing.   The discrepancies existing in the descrip-
tions of the clothing worn by the man observed fleeing from
the scene of the crime did not suffice to make the case one of
circumstantial evidence.   These discrepancies tended to do
no more than discredit the testimony of the eye-witnesses to
the killing and create a doubt as to the identity of the man
who was observed fleeing from the scene of the crime.   True,
the testimony of Root and Drolet was in a measure contra-
dicted by the testimony of those witnesses for the defendant
who swore that they glimpsed the murderer in full flight
and that he was not the defendant, but this contradiction,
coupled with the discrepancies of description, at most did no
more than create a conflict in the direct evidence which it was
the province of the jury to resolve.   Doubtless, such being the
nature of the evidence, it was competent for counsel for
the defendant to argue to the jury, as he very likely did, that

the witnesses Root and Drolet were mistaken as to the identity of the defendant as the man who shot Alioto.

[1] It is not now open to question that in a criminal case in which the prosecution relies for conviction upon direct evidence, the circumstantial evidence, if any, being merely incidental to and corroborative of the direct evidence, an instruction on the law of circumstantial evidence need not be given, and that, in such case, it should not be intimated to the jury that the case of the people is one of circumstantial evidence. (*People* v. *Lonnen*, 139 Cal. 634, [73 Pac. 586]; *People* v. *Burns*, 121 Cal. 586, [53 Pac. 1096]; *People* v. *Holden*, 13 Cal. App. 354, [109 Pac. 495].) The reason for the general rule in this behalf is to be found in the danger of misleading and confusing the jury where the inculpatory evidence consists wholly or largely of direct evidence of the crime. In such cases, as courts have repeatedly pointed out, it would be most mischievous to intimate to the jury that the prosecution was relying for a conviction upon circumstantial evidence. (*Rains* v. *State*, 88 Ala. 91, [7 South. 315]; *Coleman* v. *State*, 87 Ala. 14, [6 South. 290]; *People* v. *Kaatz*, 3 Park. Crim. (N. Y.) 129; *Langdon* v. *People*, 133 Ill. 382, [24 N. E. 874].) [2] By a parity of reasoning, it follows that where the prosecution relies for conviction upon direct evidence and the circumstantial evidence developed in the case is in fact merely incidental to and corroborative of the direct evidence, the trial court may well refuse to allow counsel for the defendant to argue the law of circumstantial evidence to the jury. The declaration of the trial court in the present case that "there is no such thing as circumstantial evidence with regard to this case" was tantamount to saying that the case was not one of circumstantial evidence, and, this being true as a matter of law, the trial court did not err in refusing to permit counsel for the defendant to argue the case to the jury upon the theory that it was one of circumstantial evidence.

Counsel for the defendant contends that the trial court erred to the prejudice of the defendant when it overruled an objection to and denied a motion to strike out evidence elicited from police detective James T. Gallagher, who testified as follows: "I was detailed to investigate this affair, and in pursuance of that, I went to the city prison with detective Bunner, and when I went into the prison this man [the de-

fendant] was there, and I was informed what he was there for, and I said, 'Oh, so you are Lapara, are you, the star witness in the Pedoni cases? You are the fine gentleman who worked for the Simon Mattress Company, who did not know anybody, but who just accidentally came in the neighborhood. Why did you kill this man—you knew Alioto. You were the star witness in the Pedoni cases, and you are the man. Now,' I said, 'Why did you kill this man—what was your reason for doing it?' and he said, 'I did not kill him.' ''

This testimony of the witness Gallagher was objected to and followed by a motion to strike out upon the ground of its incompetency, irrelevancy, and immateriality, and upon the further ground that a denial by the defendant of the accusation of guilt rendered the accusation and the conversation which led to it inadmissible for any purpose. [3] It was error to overrule the objection and likewise error to deny the motion to strike out. "It is only the guilty conduct or incriminating reply of a defendant in response to an accusation of crime or statements implicating him in its commission, that constitute relevant, competent evidence of that crime. [4] Ordinarily, when a defendant, under conditions which fairly afford him an opportunity to reply, stands mute in the face of an accusation of crime, the circumstance of his silence may be taken against him as evidence indicating an admission of guilt. (Jones on Evidence, sec. 291; *People* v. *McCrea*, 32 Cal. 98; *People* v. *Ah Yute*, 53 Cal. 614; *People* v. *Louie Fou*, 112 Cal. 24, [44 Pac. 453] ; *People* v. *Mallon*, 103 Cal. 513, [37 Pac. 512] ; *People* v. *Amaya*, 134 Cal. 536, [66 Pac. 794].) But if he promptly and fully deny the charge, the accusatory statements, standing alone, are not in any sense competent evidence of the defendant's guilt (*People* v. *Estrada*, 49 Cal. 171; *People* v. *Ah Yute*, 54 Cal. 90), and should in such a contingency be excluded from the consideration of the jury. As was said in the case of *People* v. *Teshara*, 134 Cal. 542, [66 Pac. 798], 'the court and the district attorney seem to have lost sight of the fact that it is not the accusation but the conduct of the accused that is evidence in such cases, and that the only reason for admitting an accusation is to explain the conduct.' '' (*People* v. *Ayhens*, 16 Cal. App. 618, [117 Pac. 789].) In the Teshara case, this court declared that the district attorney should not have offered the statement, knowing, as he did, that the ac-

cused had not stood silent before the accusation, but had repelled it at the time it was made; and it may not be amiss to reiterate that, for the same reason, the district attorney in the present case should not have offered the accusatory statement complained of.

Conceding that the fact that the defendant had appeared as a witness for the defendant in the case of *People* v. *Pedoni* tended, in connection with other circumstances, to show that the defendant was possessed of a motive which prompted him to commit the murder of which he was charged and convicted, still evidence of that fact should not have been presented by indirection through the medium of an inadmissible accusatory statement. But the error of its admission, in the form stated, must be held to have been harmless in the presence of previous proof, properly presented and received, without objection, of the defendant's participation as a witness in the Pedoni case. Closely scrutinized, remaining portions of the accusatory statement may perhaps, depending upon the intonation, carry an insinuation against the probity of the defendant's testimony in that case. But upon the cold record before us we are not prepared to say that the jury so closely considered and critically construed the statement in question. But if, perchance, they did so construe it, the evil thereof was undoubtedly reduced to a harmless minimum, if not entirely eradicated, by the court's charge to the jury that the law presumed that the defendant testified honestly and truthfully when a witness in the other case. Then, stripping Gallagher's statement of the text thus shown to have been harmless, there is left merely an inadmissible accusation the error of which, standing alone, will not suffice, in the light of the entire record, to warrant a reversal. This is so because there is no presumption of prejudice to a defendant from such an error or irregularity arising during the course of a criminal trial. On the contrary, it must affirmatively appear to the satisfaction of this court that a defendant may well have been substantially injured by the error complained of before a reversal of a judgment of conviction may be had. (Const., sec. 4½, art. VI.) We have carefully reviewed and considered the entire record, including the evidence, with the result that we are satisfied that the accusatory statement erroneously admitted in no degree contributed to or affected the verdict. This being so, a reversal cannot be ordered on ac-

count thereof. (*People* v. *Lawlor*, 21 Cal. App. 63, [131 Pac. 63] ; *People* v. *O'Bryan*, 165 Cal. 55, [130 Pac. 1042] ; *People* v. *Fleming*, 166 Cal. 357, [Ann. Cas. 1915B, 881, 136 Pac. 291] ; *People* v. *King*, 23 Cal. App. 259, [137 Pac. 1076] ; *Jameson* v. *Tully*, 178 Cal. 380, [173 Pac. 577] ; *People* v. *Flood* (Cal. App.), 182 Pac. 766; *People* v. *Laine* (Cal. App.), 182 Pac. 986.)

[5] We find no error in the instructions. The court defined every element of the offense charged clearly and correctly. While the court did not charge as requested that if the jury should find that the defendant did shoot and kill the deceased, but should entertain a reasonable doubt as to whether the defendant was guilty of murder in the first or second degree, they should find him guilty of the lesser degree, still, it being unquestionably clear from the evidence that the man who did the killing was guilty of murder in the first degree, and the defense interposed being solely that of mistaken identity, the court did not err in refusing to give the requested charge. The situation was not altered by the fact that the court defined murder in the second degree and submitted to the jury a form of verdict for that degree.

The judgment is affirmed.

Wilbur, J., Angellotti, C. J., Olney, J., Shaw, J., Lawlor, J., and Melvin, J., concurred.

Rehearing denied.

All the Justices concurred.