[Crim. No. 931. Second Appellate District, Division One.—April 10, 1923.]

## THE PEOPLE, Respondent, v. HERBERT WILSON, Appellant.

[1] CRIMINAL LAW—MURDER—CORPUS DELICTI—SUFFICIENCY OF EVIDENCE.—In this prosecution for murder, the evidence was sufficient to establish the *corpus delicti.*

[2] ID.—VERDICT OF MURDER IN FIRST DEGREE—SUFFICIENCY OF EVIDENCE.—In this prosecution for murder, the evidence was sufficient to justify the verdict of guilty of murder in the first degree.

[3] ID.—MOTIVE FOR MURDER—EVIDENCE—ACCUSATIONS OF DECEASED—COMMISSION OF ROBBERIES BY DEFENDANT.—In a prosecution for murder, testimony of a witness to the effect that several months prior to the homicide defendant, who was then being held in jail on a charge pending before the federal court, was taken to the federal building, and there, in the presence of several officers and of the deceased, defendant was informed that deceased had accused defendant of several robberies, is admissible on the question of motive.

---

1. Evidence of *corpus delicti* in homicide, notes, 68 L. R. A. 65, 75, 78; 7 L. R. A. (N. S.) 181.

[4] ID.—MOTIVE—EVIDENCE—TENDENCY TO PROVE CHARGE OF ANOTHER CRIME—EFFECT OF.—Where the question of motive exists, and where evidence is offered which has a tendency to establish the existence of a motive for commission of the alleged crime by defendant, the fact that such evidence tends to prove that defendant was charged with the commission of another crime does not make the evidence inadmissible for the stated purpose relating to motive.

[5] ID.—MURDER — EVIDENCE — ACCUSATIONS OF OTHER CRIMES — CONDUCT OF DEFENDANT—ERROR CURED.—In a prosecution for murder, error in overruling objections to a part of the testimony of witnesses relating to the conduct of defendant at a time when accusations for other crimes were made against him by deceased is cured by an order striking out such testimony and an instruction to disregard it.

[6] ID.—MURDER — EVIDENCE — ACCUSATION OF GUILT — STATEMENT OF DEFENDANT—SUICIDE.—In a prosecution for murder, where defendant, in reply to an accusation of guilt, went further than a denial and stated, referring to deceased, "He killed himself," such statement is admissible.

[7] ID.—ACCUSATORY STATEMENTS—WHEN INADMISSIBLE.—Ordinarily, when a defendant, under conditions which fairly afford him an opportunity to reply, stands mute in the face of an accusation of crime, the circumstance of his silence may be taken against him as evidence indicating an admission of guilt, but if he promptly and fully deny the charge, the accusatory statements, standing alone, are not in any sense competent evidence of guilt, and should be excluded from consideration by the jury.

[8] ID. — EVIDENCE — CONFESSION — THREATS AND INTIMIDATION. — A direct confession or an implied confession by mere acquiescence or silence should be excluded where made under threatening and intimidating circumstances.

[9] ID.—MURDER—TRIAL—PROOF OF CORPUS DELICTI—QUERY OF JUDGE —EFFECT OF.—In a prosecution for murder, a question asked by the court of defendant's counsel, when such counsel is presenting an objection to a question asked of a witness, as to what defect there is in the proof of the *corpus delicti* as counsel see it, is not an indication to the jury of an opinion of the court that the *corpus delicti* has been proved, where the court at the time dis-

---

4. Admissibility of evidence tending to prove other crimes against defendant as proof of motive, notes, 7 Ann. Cas. 66; 8 Ann. Cas. 773; 62 L. R. A. 199.

7. Effect of silence of accused on statement in his presence as a confession, notes, 4 Ann. Cas. 1042; 12 Ann. Cas. 875; Ann. Cas. 1913C, 240; 25 L. R. A. (N. S.) 543.

claims any expression of opinion and follows such disclaimer by an appropriate instruction.

[10] ID.—CROSS-EXAMINATION OF DEFENDANT—MATTERS NOT INCLUDED IN DIRECT EXAMINATION.—In a prosecution for murder, objections to questions asked defendant on cross-examination relating to conversations and other descriptions of fact which have not been touched upon in his direct examination should be sustained, even though the answers to the questions might tend "to show motive" or to affect the credibility of the witness.

[11] ID. — VERDICT — INDIVIDUAL OPINION OF JUROR — INSTRUCTION. — Where in a prosecution for murder the defendant requests an instruction concerning the duty of a juror to render his verdict in accordance with his individual opinion and not to be influenced in rendering a verdict of guilty "for the single reason that a majority of the jurors, or even all the other jurors, should be in favor of a verdict of guilty," and the court in giving the instruction strikes out the words "a majority of the jurors or even all the," so that the clause reads "for the single reason that other jurors should be in favor of a verdict of guilty," it fully expresses the principle upon which defendant relies in requesting the instruction.

[12] ID.—REASONABLE DOUBT—INSTRUCTIONS.—Where in a prosecution for murder the court substitutes the phrase "beyond a reasonable doubt" for the phrase "to a moral certainty beyond a reasonable doubt" in instructions as tendered, the objections to such change is hypercritical, where the court gives to the jury the usual well-accepted definition of the doctrine of reasonable doubt, including the use of the words "to a moral certainty."

[13] ID.—INTENTION OF DEFENDANT — MEANS USED IN KILLING — INSTRUCTION.—An instruction in a prosecution for murder, that in determining the intention of defendant, it is important to consider the means used to accomplish the killing, is not subject to the claim that the court thereby assumes defendant did the killing.

[14] ID.—CONSCIOUSNESS OF GUILT—EFFECT OF—INSTRUCTION.—Where in such prosecution the court, at defendant's request, gave the instruction that consciousness of guilt, if such is to be inferred, is not sufficient of itself, standing alone, to warrant or sustain a conviction, but if such inference is drawn it is a circumstance to be considered by the jury, it did not err in refusing to give the additional instruction that consciousness of guilt is an inference which may or may not be drawn from evidence introduced in the record, and whether such inference shall or shall not be drawn from the evidence is solely for the jury and that another inference cannot be legally drawn from such an inference.

[15] ID.—FAILURE TO DENY ACCUSATIONS—SITUATION OF DEFENDANT—INSTRUCTION.—Where in such prosecution defendant requested an instruction to the effect that if he refused or failed to deny any

accusations made in his presence, such fact must not be used against him unless the circumstances and surroundings of defendant were such that he was "in perfect freedom to make denial," and the court in giving such instruction substituted for the quoted phrase the phrase "free to make denial," there was a substantial compliance with the request.

[16] ID. — PREPONDERANCE OF EVIDENCE — INSUFFICIENCY TO JUSTIFY VERDICT OF GUILTY — INSTRUCTION. — When a jury in a criminal case is instructed that the defendant must not be convicted unless the facts which establish his guilt have been proved beyond a reasonable doubt, that the burden of proof is upon the prosecution, and that if upon such proof there is reasonable doubt remaining, the accused is entitled to the benefit of it by an acquittal, the instructions thus given necessarily include the proposition that a mere preponderance of evidence will not justify a verdict against the defendant.

[17] ID. — ARGUMENT OF DISTRICT ATTORNEY — ABSENCE OF PREJUDICIAL MISCONDUCT. — In this prosecution for murder, there was no prejudicial misconduct by the district attorney in his closing argument in appealing to the jury to render a verdict that would uphold the law and establish justice.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order denying a new trial. J. P. Wood, Judge. Affirmed.

The facts are stated in the opinion of the court.

Schenck & Kittrelle for Appellant.

U. S. Webb, Attorney-General, and John W. Maltman, Deputy Attorney-General, for Respondent.

CONREY, P. J. — By information the defendant was charged with the crime of murder in that on the ninth day of April, 1922, he did kill and murder one Herbert Cox. He was found guilty of murder in the first degree and sentenced to imprisonment for life. He has appealed from the judgment and from an order denying his motion for a new trial.

Departments seventeen and eighteen of the superior court of Los Angeles County are located on the second floor of a building known as the Hall of Justice. The county jail and the Hall of Justice are separated by an alley twenty feet wide. For convenience in conveying prisoners between

the jail and the courts a bridge spans this alley, connecting
with the jail on the south and the Hall of Justice on the
north. This bridge is somewhat above the ground, its floor
and sides are of cement, and its roof is flat. The bridge
is on the level of the jail door. On coming out of the jail
one crosses the bridge and then ascends a short flight of
steps to the floor of the court building. The passage there
leads to the left through a door in which there is a wicket
covered by bars and a screen. Through this door one passes
into a vestibule in the rear of the two courtrooms. Herbert
Cox received his death wound while on the bridge at a time
when he and the defendant Wilson, together with one
O'Brien, were attempting to escape from the jail.

[1] Appellant contends that the evidence is insufficient
to establish the *corpus delicti;* that is, to show that the de-
ceased came to his death as a result of criminal agency as
distinguished from suicide or accident. Appellant further
contends that the evidence is insufficient to warrant or sus-
tain his conviction.

For the purposes of the present discussion we shall as-
sume with counsel for appellant that the evidence of motive
of the defendant, which might have led him to attack the
deceased, does not form any part of the proof of the *corpus
delicti;* also that there was testimony of sundry witnesses
that Cox had made statements to them, variously, to the
effect that a man is better off dead than in jail; or that he
was going to have his liberty or die; or that if he did not
succeed in escaping, he would kill himself. The other in-
cidental questions under this head relate to the nature of
the wound and the possession of the gun with which, as
the evidence strongly tends to prove, the wound was in-
flicted.

The circumstances in evidence are such that if Cox did
not kill himself, it becomes probable that he was murdered
by another. There was no opportunity for a chance shot
from the outside. On this branch of the case the principal
contention of appellant, therefore, is that the evidence is
not sufficient to prove that Cox did not commit suicide.

A few days prior to April 9th arrangements were made
by Cox with a turnkey that for the sum of one thousand
dollars, to be paid to the turnkey, the door leading from
the jail into the bridge would be left unlocked. On the

ninth day of April the defendant gave one thousand dollars to the turnkey and asked "if the arrangements made by Cox were O. K.," and was told that they were. The turnkey reported these facts to his superior officer. At the time of the expected jailbreak, Deputy Sheriffs Wright and Bright took their stations in the courtroom of department seventeen, and Deputy Sheriffs Manning and Fox in department eighteen. Other deputies were stationed at various points outside the buildings. The jail door was left unlocked. O'Brien, Cox, and Wilson came out, crossed the bridge, and ascended the stairs. By the use of some tools they succeeded in removing the bars and screen over the wicket in the door leading into the vestibule. O'Brien, who was very small, was then pushed through the wicket into the hallway, and all of them then worked together trying to open the door. After this had continued for some time, Fox and Manning fired their Winchester rifles, the bullets striking near O'Brien, but without touching him. The four deputies came into the hall where O'Brien stood with his hands up. At this time they heard a "muffled shot" which seemed to come from down in the bridge. After the door leading from the vestibule to the bridge had been unlocked and opened, some of the deputies went to the head of the stairs and looked down upon the bridge. Cox was lying on the floor and Wilson was leaning over him. Upon examination it was found that Cox had received the wound by reason of which, a few minutes later, he died.

We will now consider the evidence of the nature of the wound as related to the question of suicide. The autopsy surgeon stated that the bullet entered the left side of the chest about two inches above the nipple, about four inches from the midline in front. It passed horizontally backward and slightly inward, penetrating the third rib, both lobes of the left lung, and passed out of the back through the sixth rib at a point about two inches from the midline of the back. The entrance wound showed a very narrow margin of burned powder and a few punctate powder marks around the wound. The embalmer testified that around the wound he saw a small ring of powder burns. This ring made a complete circle around the wound. The pistol, or "gun," with which under the evidence the shooting must have been done, was found on the floor near the body of Cox. The

pistol had been in the possession of Cox while in the jail, and there is abundant evidence that when the prisoners came out from the jail to the bridge Cox brought the pistol with him. Bright testified that when he looked down the stairs he saw Cox lying on his back with his head toward the jail and that Wilson was leaning over him; that a coat was folded up and lying somewhere near Cox's head; that he picked it up "and the gun fell out, wrapped in a handkerchief, which was tied around with a string." Cox was wearing a coat. Wilson was in his shirt-sleeves. The handkerchief was wrapped around the gun in such manner that the left side of the gun was closed next to the trigger guard and the right side was open. Bright further testified that upon examining the gun he found that it was loaded, except that there was one empty shell. It was proved by the mother of Cox, and also by his wife, that he was right-handed. His wife had seen him fire several shots from a pistol, all with the right hand, never with the left hand.

The evidence of these facts, if believed by the jury, was sufficient to warrant the jury in believing that the fatal shot was not fired by Cox. This evidence tended to prove that in shooting he would not have used the left hand; that if he had been shooting with that pistol at that time with the right hand, he could not have pressed the trigger with the thumb of that hand, and that it would be extremely difficult for a man, with his right hand, to have fired that weapon so that the bullet entering his breast where this bullet actually did, would range inward horizontally and come out two inches nearer the center line of the back. It is our conclusion that the evidence is sufficient to establish the *corpus delicti*.

[2] Appellant next contends that the evidence is insufficient to sustain the conviction. There is testimony to the effect that in November, 1921, Wilson had been informed by officers, in the presence of Cox, that Cox had accused Wilson "of the postoffice robbery, the Hale store robbery, and other jobs." There is also testimony that after the "muffled shot" had been heard, and when the officers looked down the stairway, there was no one on the bridge with Cox, except Wilson, who was leaning over Cox. Manning testified that at that time Wilson was choking Cox—or, as the same witness had said at the coroner's inquest, "seemed

to have him by the throat.'' Bright said that when he looked down there he saw Cox lying on the floor, on his back, and Wilson kneeling over him. Wilson himself, besides denying that he shot Cox, says that when he came down to the bridge he found Cox lying on the floor; that he put his coat under the head of Cox, and loosened his collar. But if certain testimony of the witness Hornbuckle is true, it becomes very certain that Wilson was down on the bridge with Cox before Cox was shot. Hornbuckle, who at that time was a prisoner in the county jail, was at work in the jail kitchen. In the north side of the kitchen there is a window located a few feet above and easterly from the bridge. Hornbuckle testified that at the time of the shooting he was sitting near this window. What he claims to have heard is stated as follows: ''It seemed like there was a scuffle first, and Cox was saying something or other to Herb. He said, 'Don't do that, Herb. You are wrong. Don't do that.' And then the shot taken effect, and that is the last I ever heard. Then the officers run in,'' etc. The cook, Lombardo (who was a county employee and not a prisoner), in his testimony confirms the fact that Hornbuckle was in the kitchen at that time, but he claims that both he and Hornbuckle were five or six feet away from the kitchen window. He heard the shot and someone moaning. Also at about that time he heard somebody say (the voice coming from outside the building), ''Don't do that.'' According to Lombardo, it was after hearing the shot that he heard these words spoken, whereas Hornbuckle claims to have heard them before the shot was fired. There is also the difference that Lombardo does not identify the voice, whereas Hornbuckle testified that he had heard Cox speak before, and that it was Cox speaking.

On behalf of appellant it is argued that the testimony of Hornbuckle was impeached in various ways, and that the character of the witness was shown to be such that he is wholly unreliable. Granting that the character of the witness and some inconsistencies in his testimony were such that his statements should have been weighed with great caution, nevertheless it was very possible that he told the truth about the particular circumstances to which his testimony referred as above stated. It was for the jury to consider and determine the question.

Concerning the events which occurred immediately following those last above mentioned, we have the testimony of the numerous deputy sheriffs and of the defendant, as well as of certain jail prisoners. Summarizing in short form, there is evidence that Wilson was ordered to put up his hands and go up to the head of the stairs, and that shortly afterward he was taken into the jail; that sundry statements and questions were directed to Wilson; that when Manning asked him what he shot the man for, Wilson replied, "I didn't shoot him. He shot himself."

There is also voluminous testimony tending to prove that after the death of Cox, and in connection with Wilson's defense to the present charge, Wilson attempted to obtain certain false statements which would tend to prove that he was not on the bridge at the time of the shooting of Cox. The record containing this evidence is filled with sundry matters of contradiction in testimony and impeachment of witnesses. Under the able guidance of counsel for appellant, who, in their brief, have very extensively explored the record, we have examined much of this testimony. In addition to that part of the evidence which tends to exclude the theory of suicide or accidental death, there is abundant evidence in the circumstances to which we have referred, which is sufficient to have justified the jury in finding that the killing was done by appellant. It is difficult to understand how it could have been done by anyone else. Some of these circumstances are sufficient to suggest a motive of revenge or interest as the cause for the crime; others show opportunity in that these two men were alone on the bridge, and one of them had a gun in his possession. Assuming that the gun was brought there by Cox, and that prior to the very minute of the shooting it had remained in his possession, this does not exclude the opportunity of Wilson to have obtained it, by violence or otherwise, immediately before the shooting occurred. Since the jury determined—and, as we think, reasonably determined—that there was no suicide and no accident, we are driven to the conclusion upon the whole case, as shown by the evidence, that it is sufficient to justify the verdict of guilty of murder in the first degree.

There remain for consideration numerous specifications of error wherein it is claimed that prejudicial erroneous rulings were made by the court at the trial in the reception of evi-

dence and in the matter of giving and refusing instructions to the jury.

[3] Overruling objections of the defendant, the court permitted a witness to give testimony to the effect that several months prior to the homicide, the defendant, who was then being held in jail on a charge pending before the United States district court, was taken to the federal building, and that there, in the presence of several officers and of the said Cox, Wilson was informed that Cox had accused Wilson of sundry robberies. In reply to the objections made, the district attorney stated to the court that the evidence was offered as relating to "the question of motive." In support of their contention that this evidence was erroneously admitted counsel for appellant refer to *People* v. *Ayhens,* 16 Cal. App. 618 [117 Pac. 789] ; *People* v. *Lapara,* 181 Cal. 66 [183 Pac. 545]. These cases are not in point. Neither one of them relates to the admission of testimony concerning circumstances having relation to the existence of a motive for commission of the crime charged in the case then on trial. [4] Where the question of motive exists, and where evidence is offered which has a tendency to establish the existence of a motive for commission of the alleged crime by the defendant, the fact that such evidence tends to prove that the defendant was charged with the commission of another crime does not make the evidence inadmissible for the stated purpose relating to motive. (*People* v. *Argentos,* 156 Cal. 720, 724 [106 Pac. 65].)

[5] The same objection was urged to the admission of similar testimony of the witnesses Cellar and Grant. Each of these witnesses also testified to the effect that Wilson did not make any reply to those accusations, or, in one instance, replied that he had nothing to say. The testimony of these witnesses, Cellar and Grant, was stricken out by the court. The jury was instructed to disregard all evidence so stricken out. Conceding that the court had erred in overruling the objections to that part of the testimony of these witnesses relating to the conduct of Wilson at the time when said accusations were made in his presence, but further taking into consideration that the accusations themselves related to matters unconnected with the present case, we are of the opinion that it was within the power of the court to cure such error, and that it was so cured by the order strik-

ing out the testimony and the instruction to disregard such testimony.

[6] Deputy Sheriff Bright testified to a conversation with the defendant in the sheriff's office in the presence of Manning, Dewar, and Biscailuz. This conversation occurred less than an hour after Cox had been shot. To the question, "What did you say to Mr. Wilson in their presence?" the defendant objected. The district attorney explained to the court that he expected to show "a lack of response." Objection overruled. The answer was, "I said to Wilson, 'You made a mistake in shooting this man. He didn't double-cross you.' He said, 'I didn't shoot him; he killed himself.'" A motion to strike out this testimony, on the ground that it was not within the rule under which it was admitted, was denied. Appellant now contends that the court erred in overruling the objection and in denying the motion.

[7] Ordinarily, when a defendant, under conditions which fairly afford him an opportunity to reply, stands mute in the face of an accusation of crime, the circumstance of his silence may be taken against him as evidence indicating an admission of guilt. But if he promptly and fully deny the charge, the accusatory statements, standing alone, are not in any sense competent evidence of the defendant's guilt, and should in such a contingency be excluded from the consideration of the jury. (*People* v. *Lapara*, 181 Cal. 66, 71 [183 Pac. 545].) In one particular, Wilson's answer was more than a denial of guilt, for he further stated, referring to Cox, "He killed himself." If the jury believed (as we have said that the evidence authorized it to believe) that Cox did not kill himself, then the affirmative statement by the defendant declaring that Cox killed himself, was a false statement relating to the very matter in issue; and being more than a mere denial of that part of the question which concerned himself, the fact that he made such statement was properly admitted in evidence. (*People* v. *Cole*, 141 Cal. 88 [74 Pac. 547].)

There were some other instances of similar character to the above-mentioned testimony of Bright wherein the testimony showed that in response to questions asking Wilson why he had killed Cox, Wilson made no response, or simply responded, "I have got an attorney that will do my talking for me." In so far as the silence of Wilson, or his reply,

did not constitute a denial of the charge, and if he was free from constraint, the evidence was admissible. (*People v. Lapara, supra; People* v. *Graney,* 48 Cal. App. 773 [192 Pac. 460].)

[8] But appellant further contends that the evidence concerning the statements made by Wilson, or his silence when accused, as shown by the testimony of the said witnesses, should have been excluded because the record shows that at the time of the accusations "the accused was menaced by half a dozen or more deputy sheriffs, each heavily armed. He was being cursed, threatened, and intimidated. Two rifles were placed against his body, accompanied by the most vile epithets and threats of immediate death, and such like." According to the testimony now under consideration, other than that of Bright, the accusations were made at the top of the stairs immediately after Wilson, under threatening orders of the officers, had come up there. A direct confession made under such circumstances might well have been excluded. (*People* v. *Fowler,* 178 Cal. 657, 662 [174 Pac. 892]; *People* v. *Miller,* 135 Cal. 69 [67 Pac. 12].) The same is true of an implied confession by mere acquiescence by silence.

Referring to the testimony of sundry witnesses to facts occurring subsequent to those constituting the *res gestae* of the alleged crime, it is contended that the court erred in overruling the objection that there was no *prima facie* showing or proof of the *corpus delicti.* For reasons which have been sufficiently indicated we think there is no merit in this contention.

[9] At the time when the defendant's attorney was presenting an objection to a question asked of the witness Wright, defendant's attorney asked permission to argue the matter outside the presence of the jury; in other words, that the jury be excused pending such argument. The court inquired whether the point presented related to the "hypothesis that the *corpus delicti* has not been shown." On receiving an affirmative reply, the court said to defendant's attorney, "What is the defect in the proof as you see it? Where is the proof insufficient?" Defendant's attorney replied that the court should not have asked such a question in the presence of the jury, and asked that the jury be instructed to disregard it; asserting that it was an indica-

tion of the judge "as to what he thinks about the facts at this time," to which the court replied, "No, it is not. The court has not expressed itself on that subject and declines to do so. Any argument you have I will now hear in the presence of the jury." Thereupon counsel refused to argue the question in the presence of the jury, and the objection was overruled. It is now contended that the court, by the proceedings and statements above noted, indicated to the jury an opinion that the *corpus delicti* had been proved, and thereby invaded the province of the jury, which is the exclusive judge of the facts. We are of the opinion that the court did not go beyond what was necessary in ruling upon the objection. The only implication in the remarks of the court was that there was sufficient evidence relating to the *corpus delicti* to authorize reception of the further evidence then being offered to the court. Moreover, the court at the time disclaimed any expression of opinion on the subject, and this was followed by an appropriate instruction when the case was submitted to the jury.

Next we have twelve assignments of error (designated H to H 11) predicated upon the cross-examination of the defendant after his direct examination as a witness on his own behalf. The point that the cross-examination, as conducted, was improper, is presented in several aspects, with numerous illustrations from the record, all of which have been examined. The main contention is that the cross-examination was permitted to extend to matters not touched upon in the examination in chief, and that they were elicited solely to prejudice the defendant, and not for any legitimate cross-examination purpose.

The first contention of this group relates to a question which was asked and, after objection and discussion, withdrawn. The asking of the question is assigned as misconduct in that the district attorney knew that the fact could not be proved and did not ask the question in good faith. After reading the discussion, as shown in the record, we conclude that the district attorney, at the time of asking the question, believed that he had a right so to do.

[10] The other points of this group relate to conversations and other descriptions of fact which had not been touched upon in the direct examination. The witness was asked whether, in December, 1921, he had been confronted

by Cox and told that Cox had told everything. The witness replied that he was not. The witness was asked whether at the time while Cox was prostrate on the bridge, he asked Cox what was the matter. The witness replied, "I said, 'For God's sake, Herb, what's wrong?'" The witness was asked whether while on the bridge he made any statement as to how Cox met his death. The witness replied, "I was asked as to the condition of Mr. Cox." He was then asked, "You didn't make any statement concerning it, whether you were asked or not?" to which the witness answered, "No, sir." He was asked whether his previous relations with Cox had always been friendly and cordial, to which the witness answered, "Yes, sir." He was asked whether he had any feeling of animosity toward Cox. This he denied. He was asked if there was any fact known to him upon April 9th to cause him to wish Cox to be out of the way, to which he replied, "None whatever." He was asked whether he had received any information prior to that time which caused him to regard Cox as being a menace to his own safety. This he denied.

The subject matter of these questions had not been included in the direct examination. The objections should have been sustained. The fact that the answers to the questions might have tended "to show motive," or to affect the credibility of the witness, is no justification for an extension of the cross-examination to a point where it conflicted with the right of the defendant to be exempt from such cross-examination beyond the scope of the matters about which he was examined in chief. (Pen. Code, sec. 1323.) It is true, however, that the answers were not such as could have seriously injured the defendant. If, in the face of his denials, the jury believed that he knew that Cox had made accusations charging him with criminal acts, or that he had a motive for wishing Cox to be out of the way, or that he had said that Cox shot himself, they would have reached the same conclusions without the testimony thus given by the defendant. If these erroneous rulings injured the defendant at all, it would be for the reason that, disbelieving these answers, the jury would be less willing to believe the other parts of his testimony. This, it must be conceded, is of some importance, and will be taken into consideration when we come to the question whether or not

upon "the entire cause, including the evidence," there has been a miscarriage of justice. (Cal. Const., art. VI, sec. 4½.)

Appellant further assigns misconduct of the district attorney and errors of the court in connection with the cross-examination of the witnesses Cronin and Baker. (One of these, as the record shows, was in the cross-examination of the witness Glaze, and not of Cronin.) These appear to be of minor importance. If the district attorney erred in asking any of these questions, that alone does not, in the instances noted, amount to misconduct, and we do not think that the court erred in any of the said rulings.

[11] The defendant requested a certain instruction concerning the duty of a juror to render his verdict in accordance with his individual opinion and not to be influenced in rendering a verdict of guilty "for the single reason that a majority of the jurors, or even all the other jurors, should be in favor of a verdict of guilty." In giving this instruction, the court struck out the words "a majority of the jurors or even all the," so that the clause read, "for the single reason that other jurors should be in favor of a verdict of guilty." Reading the instruction in full, we find that it fully expresses the principle upon which the defendant relied in requesting the instruction. Not even the defendant in a criminal action is entitled to dictate the precise terms of instructions to a jury. His right is that the court correctly and fairly state the law governing the subject matter of his defense.

[12] In several instances where the court was making application of the doctrine of reasonable doubt to the issues of this case, the instruction as tendered to the judge contained the phrase "to a moral certainty beyond a reasonable doubt," and the court substituted therefor the phrase "beyond a reasonable doubt." Also the court in one or more places struck out from instructions requested by the defendant certain language disclaiming any intention of the judge to express an opinion upon questions of fact. None of these changes in the instructions furnish a reasonable ground of complaint. The court had given to the jury the usual well-accepted definition of the doctrine of reasonable doubt, including the use of the words "to a moral certainty," in defining that state of mind wherein a "reasonable doubt"

exists; and the court had further fully and completely disclaimed any intention to express or to have expressed an opinion upon any question of fact, and had informed the jurors that they were the sole and exclusive judges of the facts as the same must be determined from the evidence, and from the evidence alone. Under these conditions, such objections are hypercritical.

[13] It is claimed by appellant that in certain of its instructions the court erroneously assumed that in fact appellant did kill the said Herbert Cox. Thus, the court said: "You are instructed that in determining the intention of the defendant at the time of the transaction complained of, it is important to consider the means used to accomplish the killing," etc. That the court did not by these words assert that in fact the killing was done by the defendant clearly follows from the concluding words of the instruction: "Therefore, if you are satisfied beyond a reasonable doubt that the defendant did," etc. (With one slight difference, this is the same instruction set forth in *People* v. *Jones,* 160 Cal. 358, at pp. 369, 370 [117 Pac. 176].)

The same objection that the court erroneously assumed the commission of the homicide by the defendant is presented concerning an instruction given in the language of section 1105 of the Penal Code. Properly understood, this instruction does not intimate or state that the commission of the homicide had been proved. The same point was passed upon by this court in *People* v. *Caballero,* 41 Cal. App. 146, 152 [182 Pac. 321], where the substance of the supreme court decisions on the same point is stated.

[14] Because the prosecution was emphasizing its effort to show conduct upon the part of the defendant indicating consciousness of guilt, the defendant requested, and the court gave, the following instruction: "Consciousness of guilt, if such is to be inferred in this case, is not sufficient of itself, standing alone, to warrant or sustain a conviction. If such inference is drawn in this case, it is a circumstance to be considered by the jury." Appellant now complains that the court did not also give to the jury the following instruction, which he at the same time requested: "Consciousness of guilt is an inference which may or may not be drawn from evidence introduced in the record. Whether such inference shall or shall not be drawn from the evidence in

the case is a question solely for the jury. Another inference cannot legally be drawn from such an inference.'' We perceive no error in the refusal of the court to give both forms of this instruction. The jury had been emphatically told that all questions of fact in the case were to be determined by the jury alone.

[15]  The defendant requested the court to give an instruction which was to the effect that if the defendant refused or failed to deny any accusations made in his presence, such fact must not be used against him unless the circumstances and surroundings of the defendant at that particular time were such that he was in perfect freedom to make denial.  Complaint is now made because the court in giving that instruction substituted for the phrase ''in perfect freedom to make denial'' the phrase ''free to make denial.''  We think that this was a substantial compliance with the request.  Immediately following the words above mentioned, the instruction closed as follows: ''If at that time he was under menace or threat of anyone, or was at that time subject to the brandishment of weapons, then his refusal or neglect to make a denial of any accusation must not be used against him.''

[16]  Appellant complains that the court refused to instruct the jury that it was not sufficient that ''the greater weight or preponderance of evidence support the allegations of the indictment,'' and refused a further request that the jury be told that ''the defendant in this case cannot be convicted unless his guilt is established by more than a preponderance of evidence.''  It is contended that the court erred in this and that nowhere in the instructions were the jury told that a preponderance of evidence was not sufficient.  It is a sufficient answer to say that when a jury in a criminal case is instructed that the defendant must not be convicted unless the facts which establish his guilt have been proved beyond a reasonable doubt, that the burden of proof is upon the prosecution, and that ''if upon such proof there is reasonable doubt remaining, the accused is entitled to the benefit of it by an acquittal,'' the instructions thus given necessarily include the proposition that a mere preponderance of the evidence will not justify a verdict against the defendant.

[17] In the course of his closing argument to the jury the district attorney said: "You, ladies and gentlemen, have it within your power to encourage every criminal within the confines of this county. You have it within your power, by stern, rugged devotion to duty, to encourage every officer of the law and to discourage every criminal. . . . I seek a conviction only to the end that the law may be upheld, that justice may prevail, and that there may be taken from the city of Los Angeles the reproach of having, with one-sixth of the population of London, more homicides annually than the latter." On hearing these statements, counsel for the defense assigned as error and misconduct the making of these statements, and asked that the court admonish the jury to disregard them. The court denied this request. Defendant further requested the court to instruct the jury that they should not be led to convict the defendant "solely for fear that a crime may go unavenged, or for the purpose of deterring others from the commission of like offenses." Arguing that the making of these statements by the district attorney was prejudicial misconduct and that the court erred in refusing the requested instruction, appellant relies upon *People* v. *Hail,* 25 Cal. App. 342 [143 Pac. 803], where numerous pertinent decisions are cited. In that case it appeared to the court of appeal, although the evidence was held to be technically sufficient to support the verdict, that there was grave doubt that the defendant was guilty of any crime. Defendant was convicted of manslaughter. In his argument to the jury, the district attorney, having first stated that if the jury should acquit this man, they would be allowing a cold-blooded murderer to go unwhipped of justice, then made this statement: "Should you do it, you would be afraid to go out on the street and meet your fellowmen." We fail to discover any close parallel between the case just now mentioned and that now before us. There is a broad difference between a palpable attempt to intimidate or influence the jury, through fear of consequences to the jurors, to return a verdict of conviction regardless of their views as to the effect of the evidence, and an appeal to the jury to render a verdict that will uphold the law and establish justice.

We summarize the remaining points concerning refusal of the court to give instructions requested by the defendant

by saying that as to those matters we discover no prejudicial error. In some instances where counsel insist that the statement of law as requested was not covered by other instructions given, we find that the same propositions are sufficiently covered by the instructions as given, and we cannot agree with counsel for appellant that the court, in effect, informed the jury that they might disregard the testimony of the defendant or any other witness upon mere caprice or whim. The jury was fully instructed concerning the presumptions in favor of innocence and the burden of proof laid upon the prosecutor, and that upon any fact in issue "the evidence must establish the truth of the fact to a reasonable and moral certainty," etc.; and that the jurors have the right to determine from the character and conduct of the witnesses and from various other circumstances (stated in the instruction) the degree of credit to be given to the testimony of those witnesses.

We have reached the conclusion that the evidence abundantly justifies the verdict and that the defendant has had the benefit of a fair and impartial trial. While we have held that the court erred in some of its rulings upon objections made by appellant to certain offered evidence, we are satisfied that those errors, when considered in connection with the entire case as presented, were, in fact, not seriously prejudicial to the rights of the defendant, and have not resulted in a miscarriage of justice.

The judgment and order are affirmed.

Houser, J., and Curtis, J., concurred.