[Crim. No. 2061.   Second Appellate District, Division One.—December 21, 1937.]

In the Matter of the Application of T. GODDARD, for a Writ of Habeas Corpus.

William M. Rains for Petitioner.

No appearance for Respondent.

THE COURT.—It is contended that petitioner was committed by the committing magistrate on a criminal charge without reasonable or probable cause. (Sec. 1487, Pen. Code.)

The petition sets forth, in part, that petitioner was charged with a violation of subdivisions 1, 2, 3, 4 and 6, of section 337a of the Penal Code. It is further alleged in the petition that the evidence adduced at the preliminary examination, a copy of which is attached to the petition and made a part thereof, discloses the following facts to be true, and which the petitioner herein admits to be true, to wit:

"That on or about the 9th day of December, 1937, the defendant went to the City of Arcadia with the intention and for the purpose of opening and conducting therein a place of business for the purpose of accepting wagers, for a commission, and then having said wagers placed by an employee of petitioner inside the enclosure at the pari-mutuel windows of the Tanforan Track at the City of San Bruno, County of San Mateo, State of California.

"That for the purpose of conducting said business said petitioner herein rented a store room at 124 East Huntington Drive, Arcadia, California, and placed thereon a large sign setting forth his character of business, a true and correct copy of which sign is set forth in the preliminary proceedings record. That the said petitioner then and there purchased advertising in the Pasadena Independent to advertise publicly his conduct of said business. The receipt for said advertisement was introduced in evidence in the said preliminary hearing proceedings.

"That the said petitioner at the time of the commencement and opening of his place of business, until the time of arrest, kept said business open during the racing at said Tanforan Track, and accepted wagers as agent and for a commission of 10% for various persons, and during said time persons did so make said wagers, which were accepted by the defendant in the conducting of his said business. That it was the custom and practice of petitioner to, and he did accept all wagers taken by him, a sufficient time prior to the running of the race at said Tanforan race track, for the petitioner to, and he did telephone to his representative who was then and there located in the near vicinity of said track, as to the amount, nature and character of said wagers, and thereupon the said representative would and did immediately go inside the enclosure at said Tanforan race track and buy pari mutuel tickets, said purchase being made inside the enclosure,—for each and every one of said bets. That said petitioner would and did get a report of said race and races and the results thereof and would and did immediately pay to the bettors at his place of business their winnings from money which said petitioner had at his said place of business. That said winnings were paid within a few minutes after the ending of each race. That thereafter the said representative inside said enclosure would and did cash the winning pari mutuel tickets so purchased and it was the intention to forward the proceeds thereof to petitioner.

"In the conduct of said business, your petitioner, as to each and every wager taken by him, at said place of business, charged a commission of 10%, and no other cost, expense or service charge. That while the petitioner was conducting a place of business such as above described, the complaining witness entered said place of business on the 10th day of December, 1937, at about the hour of 1:46 o'clock p. m.,

and shortly thereafter paid to defendant the sum of $4.40 and instructed defendant to deduct therefrom 40c as commission (being 10% of the amount to be bet) and that the balance thereof was a wager to be transmitted to the Tanforan track and to be wagered as follows: $2.00 for a show ticket on the horse known as 'Naseby' in the third race on the program on said day, and $2.00 likewise for a show ticket on the horse known as 'Pan Full' in the same race. That the petitioner in the course of the business being conducted by him as aforesaid, accepted said money for said purposes and then and there did deduct said commissions above set forth, and telephoned from said place of business to the representative of · petitioner who, at the time of said telephoning was located near the said Tanforan track at San Bruno, San Mateo County, California. That said telephone call from your petitioner to his said representative was made prior to the running of said race upon which said wagers were made. That with money then in his possession the said representative of petitioner immediately went inside the enclosure of the Tanforan race track and purchased two separate pari mutuel tickets, one in the sum of $2.00 being a show bet upon the horse known as 'Naseby' in the third race on said date, and the other likewise being a show bet ticket in the amount of $2.00 upon the horse known as 'Pan Full' in the same race.

''That both of said tickets for said wagers were made within said enclosure at pari mutuel betting windows of said track prior to the running of said race.

''That immediately following the running of said race the results thereof were obtained by petitioner, and said results showed that the said complaining witness had won upon the show ticket wagered upon the horse known as 'Naseby' and that said ticket paid the sum of $2.80. Thereupon your petitioner, out of moneys at his place of business, paid immediately the said winnings in the sum of $2.80 to the complaining witness.

''That upon the evidence summarized above (and more particularly set forth in the transcript of the proceedings attached hereto and made a part hereof) the said Ardene D. Boller, Judge of the City Court, at said preliminary hearing found against the contentions raised by the defendant and ordered the said defendant committed, a copy of which said commitment is attached hereto, made a part hereof and

marked 'Exhibit B'. That by reason of such proceedings, and the findings and commitment at said preliminary hearing by the said Arcadia City Court, the defendant is now imprisoned, confined and restrained of his liberty, all as heretofore alleged.''

It was also established at the preliminary hearing that petitioner entered a record of said bets in a book kept for such purpose and also furnished a ticket or receipt to each customer as evidence of each bet made as hereinbefore recited.

The decisive question involves the construction and interpretation of chapter 769, Statutes of 1933, page 2046, which is, as the title of the act in part recites, ''An act to provide for the regulation and licensing of horse racing, horse race meetings, and the wagering on the results thereof . . . '' ; approved by the governor June 5, 1933, in effect June 27, 1933, commonly known and hereafter referred to as the ''Horse Racing Act''. At the outset and in order to avoid confusion, it should be noted that another act, to wit, chapter 436, Statutes of 1933, page 1127, bearing the identical title, was approved by the governor May 18, 1933, in effect June 27, 1933. Said chapter 436 is identical with chapter 769, except in the following particulars: Chapter 436 provides for 66 racing days in counties of the first class, and provides for a racing board of five members, to be appointed by the governor and approved by the senate, whereas chapter 769 provides for 100 racing days in counties of the first class and for a horse racing board of three members, to be appointed by the governor, with no approval by the senate required. Without going into detail, it is sufficient to state that an examination of the legislative history of these two acts will reveal that chapter 769 is the effective chapter of the two and may be regarded as the law of the state on the subject-matter thereof.

The Horse Racing Act creates and establishes the ''California Horse Racing Board'' and fixes the powers and duties of such board. Among other things the act provides that, ''Said board shall make rules governing, permitting and regulating mutual wagering on horse races under the system known as pari mutuel method of wagering, which shall be conducted only by such licensee and only within the enclosure and only on the dates for which such horse racing has been licensed by the board. All other forms of wagering or betting

on the result of a horse race shall be and remain illegal and any and all wagering or betting on horse races outside the enclosure where such horse races shall have been licensed by the board shall be and remain illegal." By the terms of the act horse racing and the wagering on the results thereof can be lawfully conducted only by a licensee of the board at a place and on the dates specified in the license. Moreover, the act provides that, "There shall be no wagering on the results of any such horse race or horse races except under the pari mutuel method of wagering", as therein provided. Said act further provides that "Any. licensee conducting a horse race meeting shall provide a place or places in the race meeting grounds or enclosure at which such licensee may conduct, operate and supervise the pari mutuel or mutual method of wagering upon the results of said races so conducted and within its enclosure; and said system of wagering shall be operated only by the installation and use of the totalisator or such mechanical equipment as may be approved by the board, but such board shall not require any particular make of mechanical equipment; provided, that such wagering shall not be held or construed to be unlawful, any other statute of the state of California to the contrary notwithstanding. No other method of betting, pool making or wagering shall be permitted or used by such licensee, and said mutual method of wagering shall be carried on and conducted in the manner aforesaid and not outside of the track or enclosure of a licensee," and the act provides, also, that *"Any person wagering upon the results of a horse race, except in the pari mutuel or mutual method of wagering, when the same is conducted by a licensee and upon the grounds or enclosure of said licensee, shall be punishable as provided in the Penal Code."*

The Horse Racing Act, by its terms, is declared to be for the purpose of the encouragement of agriculture and the breeding of horses in the state of California, and provides for a percentage of the money of every purse won by an animal bred in the state of California to be paid to the breeder of such animal.

Section 3 of the Horse Racing Act was amended by the legislature in 1935 by the addition of one sentence. Section 3 now reads as follows (the sentence added by said amendment is in italics) : "Said racing board shall have full power to prescribe rules, regulations and conditions consistent with

the provisions of this act under which all horse races, upon the results of which there shall be wagering, shall be conducted within the State of California. Said board shall make rules governing, permitting and regulating mutual wagering on horse races under the system known as pari mutuel method of wagering, which shall be conducted only by such licensee and only within the enclosure and only on the dates for which such horse racing has been licensed by the board. *A wager made inside an enclosure under the pari mutuel system for a principal who is not within the enclosure shall be considered a wager made within the enclosure for the purpose of this act and any activity of the principal in connection with such wager shall not be considered a wager made outside the enclosure.* All other forms of wagering or betting on the result of a horse race shall be and remain illegal and any and all wagering or betting on horse races outside the enclosure where such horse races shall have been licensed by the board shall be and remain illegal.''

It is contended by petitioner that section 3 of the act, as amended, repeals by implication section 337a of the Penal Code, and that therefore the business as conducted by petitioner, as well as the acts alleged to be a violation of section 337a of the Penal Code, are lawful and constitute no violation of said section 337a. It is further contended that the amendment, although it refers only to the conduct of a ''principal'' necessarily incorporates in its contemplation an agent as well. Furthermore, it is contended that the amendment adds, for the benefit of the state, a revenue-producing plan to the purpose of the act.

The ultimate determination of these questions depends upon the meaning to be given to the sentence added by the amendment hereinbefore quoted, which meaning manifestly can be determined only by a consideration and application of certain well-known and long-established rules of construction and interpretation. In that connection, it is well settled that, ''It is a cardinal rule in the interpretation of a statute that all its provisions shall be given effect, if possible, and if, by proper construction of the language used in different sections, provisions which are apparently conflicting can be harmonized, it is the duty of courts to so interpret the statute that all its provisions will be allowed to stand. It is not to be assumed that the legislature intended by the same statute to enact two inconsistent provisions.'' (*Hale* v. *Mc-*

*Gettigan,* 114 Cal. 112, at 117 [45 Pac. 1049].) (See, also, *Lucchesi* v. *State Board of Equalization,* 137 Cal. App. 478, 482 [31 Pac. (2d) 800].) Fundamentally it is the court's first duty to determine the intention of the legislature, if possible, and that intention must be gathered from the words of the statute. As the Supreme Court has asserted, ''This court has no power to rewrite the statute so as to make it conform to a presumed intention which is not expressed. This court is limited to interpreting the statute, and such interpretation must be based on the language used. By the express provisions of section 1858 of the Code of Civil Procedure, 'In the construction of a statute . . . the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted.' It is elementary that there can be no intent in a statute not expressed in its words; that the intention of the legislature must be determined from the language of the statute. (Citing cases.) As stated in *City of Eureka* v. *Diaz,* 89 Cal. 467, at page 469 [26 Pac. 961] : 'It is a cardinal rule in the construction of statutes that the intent of the legislature should be followed, but this is subject to the imperative and paramount rule that the court cannot depart from the meaning of language which is free from ambiguity, although the consequence would be to defeat the object of the act.' '' (*Seaboard Acceptance Corp.* v. *Shay,* 214 Cal. 361, 365 [5 Pac. (2d) 882].) And, as further declared by the Supreme Court, ''The statute, of course, must be read and construed as a whole in harmony with other statutes relating to the same general subject (citing cases).'' (*In re Marquez,* 3 Cal. (2d) 625, 628 [45 Pac. (2d) 342].)

The rule, that an exception to a statute general in its terms, to be effectual must be specific, is approved in *Los Angeles Railway Corp.* v. *Los Angeles Flood Control Dist.,* 78 Cal. App. 173, 182 [248 Pac. 532], wherein it is affirmed that, ''It is unnecessary to cite authorities to the rule that when a statute is general in its terms any exemption or exception from its operation must be specific.'' And again, in *Rothschild* v. *Superior Court,* 109 Cal. App. 345, at 348 [293 Pac. 106], it is said, ''We cannot overlook the well-settled principle that when the legislature has made exceptions to a general rule it must be deemed to have included

in its exceptions all that it intended to except.'' It should be noted here, as has been often declared, that ''The provisions of the code—indeed of all the codes—are to be construed with relation to each other 'as though all such codes had been passed at the same moment of time and were parts of the same statute'. (Citing cases.) That is to say, the codes must be construed as a single statute. (*McKay* v. *McKay,* 125 Cal. 65 [57 Pac. 677].) Hence the rule of statutory construction that an express exception is not to be extended beyond the fair import of its terms (citing cases) . . . '', and, ''that an exception should be strictly construed''. (*Merchants Nat. Bank* v. *Continental Nat. Bank,* 98 Cal. App. 523, 532 [277 Pac. 354].)

With respect to the purpose of a statute, the courts have uniformly held that, ''The language of the statute is to be so construed, when it reasonably can be, as to promote, rather than defeat the obvious purposes of the legislature''. (*People* v. *Arthur,* 1 Cal. App. (2d) 768, 771 [32 Pac. (2d) 1002].) And on the same subject the Supreme Court, in phraseology singularly applicable to the case at bar declared: ''Since it is apparent that the section of the act under consideration is not clear and definite in expressing any of the above suggested alternatives, it becomes the duty of this court to construe the same with reference to the purposes sought to be served and the public policy underlying the legislation.'' (*Golden Gate Ferry Co.* v. *Railroad Com.,* 204 Cal. 305, 312 [268 Pac. 355].)

The policy of the state toward commercial gambling is clear and unequivocal. A mere superficial reference to the Penal Code reveals that commercial gambling in all of its phases has been uniformly condemned for many years. Indeed, this well-established policy of the state is reflected, in a measure, in connection with the manner of adoption of the Horse Racing Act. After adopting the measure, it was provided that it should not become the law until approved by the people, according to the terms of the act, in the following manner, to wit, ''Section 19. This act shall take effect upon the adoption of a constitutional amendment ratifying its provisions.''

The policy of the state in this connection is again reflected in the argument in favor of the adoption of the Horse Racing Act, which was contained in the official copy of the pro-

posed amendments and arguments distributed by the secretary of state, according to law, preceding the election by which said act was approved by the people. The argument in part was as follows: ''Wagering will be confined to licensed race track enclosures—thus aiding in the elimination of pool rooms and such other undesirable places.'' The people approved the Horse Racing Act, as proposed by the legislature, at a special election by adopting section 25a of article IV of the Constitution. (Stats. 1933, p. 3160.) Manifestly, the approval by the people was in accord with the above-mentioned policy of the state, and must be assumed to have been so, in the light of the argument submitted for their consideration to the effect that wagering on horse racing would be confined to licensed race track enclosures ''thus aiding in the elimination of pool rooms and such other undesirable places''. There is nothing in the Horse Racing Act indicating the slightest intention to depart from the public policy of the state condemning commercial gambling. To the contrary, a determination to adhere to such policy is obvious. For example, the Horse Racing Act repeatedly declares that wagering on horse races shall be limited to the so-called ''pari mutuel method of wagering''; that such wagering shall take place only at the track; and that any other form of wagering or any wagering taking place elsewhere than at the track (outside the enclosure) ''shall be and remain illegal''. The declared purpose of the act, as heretofore noted, is for the purpose of ''the encouragement of agriculture and the breeding of horses in the State of California''. Although it was not declared in so many words, a parallel purpose to preserve the public policy of the state against commercial gambling is clearly evident from the terms of the act. There is nothing in the language of the 1935 amendment to section 3 of the act that literally indicates an intention to depart from this policy. If any such intention was contemplated by the legislature it was effectively concealed. In order to give section 3, as amended, a meaning and interpretation that in effect would repeal by implication section 337a of the Penal Code as well as repeal by implication the other provisions of the Horse Racing Act, it would be necessary to add words to the amendment which such amendment does not contain. This the court is without the power to do. As the Supreme Court has recently declared,

"In order for the second law to repeal or supersede the first, the former must constitute a revision of the entire subject, so that the court may say that it was intended to be a substitute for the first. The presumption is against repeals by implication, especially where the prior act has been generally understood and acted upon. To overcome the presumption the two acts must be irreconcilable, clearly repugnant, and so inconsistent that the two cannot have concurrent operation. The courts are bound, if possible, to maintain the integrity of both statutes if the two may stand together. Where a modification will suffice, a repeal will not be presumed. (Citing cases.)" (*Penziner* v. *West American Finance Co.,* 10 Cal. (2d) 160 [74 Pac. (2d) 252].)

Division Two of the District Court of Appeal for the Second Appellate District and the District Court of Appeal for the Fourth Appellate District have apparently reached the same conclusion, although the identical question was not raised in the cases therein decided. (*In re William A. McKelvey and Ray Hawley for Writs of Habeas Corpus,* 19 Cal. App. (2d) 94 [64 Pac. (2d) 1002], and *People* v. *Torrey,* 16 Cal. App. (2d) 470 [60 Pac. (2d) 900].)

To conclude, in the light of the foregoing, that section 3 of the Horse Racing Act, as amended, is intended to repeal section 337a of the Penal Code and to repeal the other provisions of the Horse Racing Act above referred to, would be to attribute to the legislature a degree of perfidy of which even those most prejudiced would disapprove.

The argument that there is no difference in principle between the act of placing a bet in a poolroom or with a bookmaker and placing a bet in a pari mutuel machine at the races, is without merit. It is a matter of common knowledge, (and obviously the reason for the adoption in the act of such method of wagering), that all of the money deposited with the pari mutuel machines by the wagering public at the races is divided, less the commissions provided by law, among those who happen to purchase tickets on the winning horses. Those who wager under the pari mutuel system are not contending with each other, or with someone else. Moreover, it is quite evident, and was doubtless contemplated at the time the Horse Racing Act was approved by the people, that horse racing, as conducted under and according to the terms of the act, is quite different in many respects from

mere gambling, as such. Horse racing is regarded as a form of recreation and sport. Its social phases and many other phases, industrial and economical, were doubtless taken into account by the people at the time the act received the official approval of the electorate. Betting on the outcome of a horse race at an establishment such as conducted and maintained by the petitioner herein is unquestionably commercial gambling and bears no resemblance whatever to the wagering on horse racing by a spectator attending the races, within the enclosure of a licensed track as contemplated by the Horse Racing Act.

The foregoing reasoning, which disposes of petitioner's contention that the amended act repeals by implication section 337a of the Penal Code applies with equal force to the two further contentions: namely, that although the act refers only to the conduct of a "principal", it necessarily contemplates an "agent"; and that the amendment adds a revenue-producing plan to the purpose of the act.

■ Section 3 of the Horse Racing Act, as amended, affords no defense for one who maintains and operates, as petitioner herein maintained and operated, an establishment outside the track enclosure for the purpose of aiding, soliciting, encouraging and promoting commercialized gambling upon the results of races at which neither he nor his so-called "principal" are spectators. The claim, therefore, that such conduct and acts are within the purview of the Horse Racing Act is a mere subterfuge and an attempt to circumvent the established policy of the state against commercial gambling, and is without legal sanction either in the Horse Racing Act as originally adopted or as subsequently amended.

It follows from the foregoing reasoning that the writ of *habeas corpus* heretofore issued in this cause should be, and it is, discharged, and the petitioner is remanded to the custody of the sheriff of Los Angeles County.