[Crim. No. 4710. In Bank. Nov. 1, 1946.]

THE PEOPLE, Respondent, v. THOMAS M. JERMAN, Appellant.

190

A. H. McConnell for Appellant.

Robert W. Kenny, Attorney General, Everett W. Mattoon and Frank Richards, Deputies Attorney General, Fred N. Howser, District Attorney, and Jere J. Sullivan, Deputy District Attorney, for Respondent.

EDMONDS, J.—Thomas M. Jerman was convicted by a jury of the crimes of keeping or occupying a room with paraphernalia for the purpose of recording or registering a bet on a horse race (Pen. Code, § 337a, subd. 2), and of recording and registering such bet (Pen. Code, § 337a, subd. 4). The questions presented upon this appeal from the judgments and from the order denying a new trial concern the admissibility of certain telephone conversations and the refusal of the trial court to give three requested instructions.

About 2 o'clock in the afternoon, William F. Stovall and James Thiele, police officers of the city of Long Beach, entered the dwelling house occupied by Jerman, his mother and two sisters. The officers found Jerman, a cripple confined to his bed, dialing a French type telephone, which was an extension of a hall telephone. There were pens, pencils, and stationery in a desk or filing cabinet attached to an iron pipe which could be swung over his bed. At the left of the bed there was a radio which, when they entered the room, was tuned to a broadcast of race track results. Stovall took the telephone from Jerman but the line was dead. It was then discovered that the receiver of the hall telephone had been taken off the hook.

Within 10 minutes after the officers arrived, there was a call on Jerman's telephone and 10 or more followed at frequent intervals. These calls were answered by Officer Stovall. Concerning the first one of them, Stovall testified; ". . . A male voice on the phone asked, 'Tommy?' And I said 'Yes.' He said, 'Give me Bay Meadows, 22, one to place; 32, one to place; 64, one to place; did you get it?' I said 'Yes.' And he hung up." The next caller, Stovall told the jury, asked for "Tommy." As the officer related the conversation, the male voice then said, "This is Perry. . . . Give me Blitzkreig in the sixth, one to win; Freedom Ring, one to win and Gallant Devil, one to win. . . . Did you get it?" Immediately after this conversation, the officer went on, Jerman said: "Stovall, will you put it on one of my own blanks, so I can read it. I am liable to be stuck with it, if you don't." The third call, Stovall said, came from a Mrs. Warren who asked: "Give me Rock Wood Boy, 10 to win, five to place and five to show."

In the room where Jerman was lying, the officers found a Metropolitan Scratch Sheet and a daily racing form. Some of the leaves in the racing form were still uncut. Under some

clothing in a closet, Jerman's sister, at his direction, produced a black book, which Officer Stovall stated was a betting record. Also found in the room were some torn sheets of paper which Stovall declared were betting markers of a previous date, and a number of papers bearing the names of race horses and the notation, "No bets accepted." Questioned as to the money which Jerman had at the time of these conversations, Officer Thiele stated that in one of the compartments of the stand or bed-desk that revolved over the bed, there was something like a wallet, which contained $490 in denominations of fifties, twenties, tens, fives and ones. In a folder on the stand there was other money, which the witness did not count.

Stovall testified that the significance of the language of the first call, "Bay Meadows, 22, one to place," in the ordinary course of bookmaking activities in the area, was that the caller wanted to have a dollar placed on the second horse in the second race at Bay Meadows Park to come in second in the race. In answer to the question, "In your opinion, as an expert, what would you regard that in the language used among bookmakers operating in this area?" he replied, "It signified to me that the person 'Tommy' to whom this conversation was directed was receiving bets over the telephone on horse racing." He further testified that he formed the same opinion as to the other telephone calls.

In his own defense, Jerman told the jury: "I am a system analyst and also operate a handicapping system service. . . . I have developed a racing system and sell it to the general public" for $200. The buyer agreed to pay 10 per cent of his winnings, said Jerman, for a period of 90 days. If at the end of the 90-day period the 10 per cent did not amount to $200, the client paid any balance due. Under this system, he had no financial interest in any bets made by his "clients." He explained that he used a racing form and under the plan his customers "call in their selections every day and I check them, that is, make any corrections and errors that they might make and also see if they have mastered the system or handicap method, whatever one I have sold them"; that he then marked down such selections on betting sheets; and that "when I first teach them this system, I require them to call their selections to me on a probationary period—about 10 to 12 days—until I am sure that they have it mastered."

Jerman admitted that, by means of a loud speaker which the officers attached to the telephone, he heard a number of

the conversations. The names of five or six of the callers he recognized as those of his clients.

Concerning the betting sheets and other papers found in his room, Jerman explained that they were records of bets made by purchasers of his system. However, these were not records of bets made with him, or with any person known to him, and he had no financial interest in any bet so made by his clients or recorded by him on the betting sheets. The black book found in the closet, Jerman said, "was a record of my system and handicap players"; that the entries therein contained "were phoned to me by a party who bought my handicapping method. . . . I wrote them down here just the same as they gave them to me over the telephone"; and that by reference to his Metropolitan Scratch Sheet he could tell how many of the selections had won. When asked, "And when the player calls, you record and register that bet upon your record sheets; is that right?", Jerman replied, "That is right." And in answer to several questions, Jerman each time stated that the bets he recorded had been made with bookmakers."

Three instructions requested by Jerman were refused by the court. To convict Jerman upon circumstantial evidence, the first of these stated, "it is necessary not only that all the circumstances concur to show that the defendant committed the crime charged, but it must also be shown that these circumstances taken as a whole are inconsistent with any other rational conclusion, . . ." The second instruction declared that if the jurors believed that the books and records found in Jerman's room were the same as those customarily used by bookmakers for the purpose of registering and recording bets, they must acquit him unless they also found, beyond a reasonable doubt, that the room referred to in the evidence was occupied by him for the purpose of recording and registering bets or wagers upon the results of horse races. The last of the three instructions directed an acquittal if the jurors found that the purpose of Jerman in making the memorandum of bets and wagers was to check the operations of a betting or handicapping system sold by him, and that he was not a party to those bets and had no financial interest in them.

The appellant's first contention is that the conversations over the telephone in his room at the time of his arrest constituted hearsay evidence, which was improperly admitted over objection. As to the three instructions requested by him, he

takes the position that because the evidence is entirely circumstantial, he was entitled to have the jury directed in regard to the rule concerning the weight which it might give such evidence. He also stands upon his asserted right to two of the instructions as stating in explicit terms the theory of his defense.

In support of the judgment of conviction, the attorney general argues that, under the decisions of this state, the so-called hearsay evidence was properly admitted. This testimony related to contemporaneous facts which form part of the res gestae. Moreover, there was ample evidence to sustain the conviction upon each count independent of the telephone conversations, for section 337a of the Penal Code makes it a crime for any person, whether for gain, hire, reward, or gratuitously, or otherwise, to record or register any bet. Jerman's own testimony, says the attorney general, proves conclusively that he recorded and registered bets in violation of the statute.

As to the refused instruction concerning circumstantial evidence, the People assert that the evidence against Jerman was both direct and circumstantial. The direct evidence included the testimony of the officers in regard to the various articles and equipment found in Jerman's room. Also, says respondent, the telephone conversations and the recordation of bets constituted direct evidence. And where the prosecution relies for conviction upon direct evidence, offering circumstantial evidence which is merely incidental to and corroborative of the direct evidence, the jury need not be charged that, to warrant a conviction, the circumstantial evidence must be inconsistent with any other rational conclusion. At least, if the evidence against a defendant is not "wholly circumstantial," no miscarriage of justice results from a failure to give such an instruction. But considering the guilt of Jerman as being proved either entirely or partially by circumstantial evidence, the attorney general insists that the instructions given by the court concerning the evidence were entirely sufficient to satisfy the law's requirement. As to the other two instructions requested by Jerman and refused, it is argued that the rules of law stated in them were fully covered by other charges to the jury, and no prejudicial error resulted from the failure to give them.

Section 337a, subdivision 2, of the Penal Code reads as follows: "Every person, . . . 2. Who, whether for gain, hire,

reward, or gratuitously, or otherwise, keeps or occupies, for any period of time whatsoever, any room, . . . building . . . place, stand or inclosure, of any kind, or any part thereof with a book or books, paper or papers, apparatus, device or paraphernalia, for the purpose of recording or registering any bet or bets, or any purported bet or bets, or wager or wagers, or any purported wager or wagers, . . . upon the result or purported result, of any trial, or purported trial, or contest, or purported contest, of skill, speed or power of endurance of man or beast, or between men, beasts, or mechanical apparatus, or upon the result, or purported result, of any lot, chance, casualty, unknown or contingent event whatsoever'' is guilty of a felony.

Subdivision 4 of the same section provides: ''Every person, . . . 4. Who, whether for gain, hire, reward, or gratuitously, or otherwise, at any time or place, records, or registers any bet or bets, wager or wagers, upon the result, or purported result, of any trial, or purported trial, or contest, or purported contest, of skill, speed or power of endurance of man or beast, or between men, beasts, or mechanical apparatus, or upon the result or purported result, of any lot, chance, casualty, unknown or contingent event whatsoever,'' is guilty of a felony.

By subdivisions 2 and 4 of this statute, the Legislature has defined as a crime either the occupying of a room with paraphernalia for the purpose of recording or registering a bet upon a horse race, or the recording or registering of such a bet. From the clear and definite wording of subdivision 4, it is apparent that the Legislature intended to make the recording or registering of a bet a crime. There is no qualification stated in regard to such an act. It is quite immaterial whether or not the recorder is the bookmaker or connected with the bookmaker with whom the bet is placed. Financial interest in the bet is not an element of the crime, and the provisions specifically include one who acts gratuitously.

This conclusion is compelled, not only by the wording of the quoted subdivision, but by other comprehensive provisions of the section, which was enacted in 1909. The holding or forwarding of money bet, or to be bet, is made an offense by subdivision 3 of the section and, by subdivision 6, bookmaking is denounced as a crime. Each of these acts is made a separate and distinct felony (see *People* v. *Plath*, 166 Cal. 227 [135 P. 954]), and the legislation authorizing horse racing with the pari-mutuel system of betting, enacted in 1933,

made no change in the law proscribing commercial gambling. (*In re Goddard*, 24 Cal.App.2d 132 [74 P.2d 818].) By the adoption of the Horse Racing Act (now Bus. & Prof. Code, div. 8, ch. 4), "the legislature not only did not intend to repeal the general law prohibiting general betting and registering of bets on horse races, but intended that the law remain in force subject to one exception, namely, that pari-mutuel betting be permitted if conducted in the manner and under the conditions specified in the act." (*People* v. *Torrey*, 16 Cal.App.2d 470, 472 [60 P.2d 900].) An important condition of such betting is that it shall take place only at the track (Bus. & Prof. Code, § 19590), and no other method of betting or wagering is permitted. (Bus. & Prof. Code, § 19593.)

The recordation or registration of a wager not made by the pari-mutuel system at the track signifies that illegal betting is taking place, and the activities connected therewith afford law enforcement officers the most effective means of reaching and combating the evil denounced by the Legislature. If the conduct described by Jerman were a legitimate business, a bookmaker could successfully avoid detection, for there might be no record of a bet other than on the sheets of the person who noted it for the ostensible purpose of furnishing a check upon the efficacy of a betting system. Clearly such conduct and acts are within the purview of section 337a of the Penal Code and constitute an attempt to circumvent, by subterfuge, the established policy of the state against commercial gambling.

The direct testimony of Jerman shows that he occupied a room with paraphernalia for the purpose of registering and recording illegal bets upon horse races, and also that he registered and recorded at least one such bet. The judgment of conviction is, therefore, amply supported by his testimony, and it is not necessary to consider the question of law presented by him concerning the admissibility of the telephone conversations. If these conversations were properly received in evidence, they tended to prove either the acts which Jerman admitted or conduct constituting a crime or crimes of which he was neither charged nor convicted. The admission of incompetent evidence which is merely cumulative of a defendant's testimony, or of immaterial evidence, does not amount to prejudicial error (*People* v. *Ives*, 17 Cal. 2d 459, 465 [110 P.2d 408] ; *People* v. *Kalpakoff*, 40 Cal.App. 2d 670, 672 [105 P.2d 595] ; *People* v. *McNeil*, 27 Cal.App.2d

353, 357 [81 P.2d 243]), ██ and a defendant is not entitled to a reversal of a judgment of conviction by the court's failure to instruct upon such evidence.

██ Moreover, a court is not required to instruct upon the rules of law applicable to circumstantial evidence which is incidental to and corroborative of direct evidence. (*People* v. *Lapara,* 181 Cal. 66, 70 [183 P. 545]; *People* v. *Lonnen,* 139 Cal. 634, 637 [73 P. 586]; *People* v. *Burns,* 121 Cal. 529, 532 [53 P. 1096]; *People* v. *Corlett,* 67 Cal.App.2d 33, 48 [153 P.2d 595, 964].) The reason for this rule is found in the danger of misleading and confusing the jury where the inculpatory evidence consists wholly or largely of direct evidence of the crime. (*People* v. *Lapara, supra,* p. 70.)

██ And an instruction that the circumstances must not only be entirely consistent with the theory of guilt but must be inconsistent with any other rational conclusion is properly refused where, as here, the case does not admit of two theories, the defendant by his own testimony having admitted his commission of the crime. (*People* v. *Raber,* 168 Cal. 316 [143 P. 317].)

No error, therefore, was committed by the trial court in refusing to give Jerman's requested instruction concerning circumstantial evidence. ██ The ruling upon the second charge submitted by him was also correct. The statement of the terms of subdivision 2 of section 337a of the Penal Code, and of the doctrine of reasonable doubt, was a duplication of instructions given by the court. ██ The one submitted by Jerman directing the jury to acquit him if it found that he had recorded or registered bets in which he had no financial interest and to which he was not a party directly contradicts the provisions of the statute which the district attorney accused him of violating and was properly refused.

The judgments and the order denying a new trial are, and each of them is, affirmed.

Gibson, C. J., Shenk, J., Traynor, J., and Spence, J., concurred.

CARTER, J.—I dissent.

The general rule stated by the majority opinion is far too broad and is outside the scope of the statute. It is said: "From the clear and definite wording of subdivision 4, it is apparent

that the legislature intended to make the recording or registering of a bet a crime. There is no qualification stated in regard to such an act. It is quite immaterial whether or not the recorder is the bookmaker, or connected with the bookmaker with whom the bet is placed. Financial interest in the bet is not an element of the crime, and the provisions specifically include one who acts gratuitously." Under that rule a person who placed a bet with a bookmaker and made a notation for his own convenience would be guilty of a felony. Likewise, his stenographer or bookkeeper who kept his records, would be guilty. Many other illustrations could be imagined. Baldly stated the rule makes unlawful any writing down of a bet, other than a bet made at the race track, at any time, any place, by any person. While the literal wording of subdivision 4 of section 337a of the Penal Code might justify such a rule, that subdivision must be read in the light of all the other subdivisions of the section and the evil at which the statute is aimed, namely, bookmaking. That such is the purpose of the section is evident from the first subdivision which declares unlawful "book-making." In order to facilitate the enforcement of that provision, subdivision 2 condemns the keeping or occupancy of any place having bookmaking paraphernalia therein. The essence of the matter still is, that it must have *some connection with bookmaking*. The paraphernalia must, as expressed in that subdivision, be kept for "recording or registering" bets, that is, bookmaking. To embrace more individuals and further aid in the enforcement of said section, subdivision 3 denounces persons who receive, hold or forward anything staked on a bet. Still it is dealing with the subject of bookmaking. Subdivision 5 extends to persons permitting other persons using their premises for the denounced purposes. Subdivision 6 proscribes the laying, offering or acceptance of bets. Hence it must be clear that before there may be a violation of subdivision 4, that is, the recording or registering of bets, there must be some connection between those acts and bookmaking. The registration or recording must be done for the purpose of noting a bet that is to be or has been made by the acceptor, recipient or taker of the bet or the one who is to place it with an acceptor. The one taking the bets is the bookmaker.

It is firmly established that the words "registering" and "recording" refer to and are connected with bookmaking—the taking of bets. It is said in Corpus Juris Secundum:

"Bookmaking. A species of betting on races; the business of receiving and accepting bets or wagers on the result of races, usually after quoting odds to prospective betters and having them write out slips. The term imports some method of recording bets; and, while analogous to "pool selling," strictly speaking, it is distinguished therefrom." (38 C.J.S., Gaming, § 1, p. 54.) It is stated in *Spies* v. *Rosenstock*, 87 Md. 14 [39 A. 268, 269] : "that the business of bookmaking is betting on horse races, and is called bookmaking because the bets are booked, or a record kept of them in a book." (See, also, *People* v. *Langan*, 196 N.Y. 260 [89 N.E. 921, 17 Ann.Cas. 1081, 25 L.R.A.N.S. 479].)

It follows in the instant case that the trial court erred in refusing to give the instructions offered by defendant which would have submitted to the jury the issue of whether he was recording bets in the process of bookmaking. If his testimony is to be believed, he wrote the bets down—kept a record of them, but as he was not the acceptor, recipient or taker of bets, nor acting for anyone who was, and since he did not purport to place such bets with anyone, he was not, therefore, a bookmaker within any of the accepted definitions of that term. The ones to whom he sold his "system" placed their own bets with bookmakers and reported them to him. He merely compiled them into a record from which he evolved a "system" designed to enable them to increase their winnings. In my opinion the making of such a record does not constitute a violation of the statute denouncing bookmaking as a crime. For the foregoing reasons the judgment should be reversed.

Schauer, J., concurred.