[Crim. No. 4564.   Second Dist., Div. Two.   July 18, 1951.]

THE PEOPLE, Respondent, v. MARVIN KOBEY et al., Appellants.

William B. Beirne and David H. Cannon for Appellants.

Edmund G. Brown, Attorney General, Frank Richards, Deputy Attorney General, William E. Simpson, District Attorney, Jere J. Sullivan and Joseph T. Powers, Deputy District Attorneys, for Respondent.

MOORE, P. J.—Defendants appeal from judgments entered pursuant to verdicts of guilty as charged under an indictment for conspiracy to violate sections 337a and 321 of the Penal Code. They demand reversal on the grounds of the insufficiency of the evidence, errors in receiving certain evidence and errors in giving specified instructions.

The evidence introduced at the trial demonstrates conclusively that appellants were all participants in a vast bookmaking conspiracy which operated in the Los Angeles area for a period of several years prior to the date of the indictment, filed November 17, 1949. The bookmaking organization was carried on behind the trappings of three ostensibly legitimate business entities, to wit, Guarantee Finance Company, a corporation, Guarantee Discount Company, a partnership, and the Colby Collection Agency, an apparent partnership. All of such agencies, partnerships, organizations and companies are herein referred to collectively as the "group," "company," "organization," or "enterprise."

Headquarters for the conspirators and for the above concerns was located in a two-story business building on Florence Avenue in the suburbs of the city of Los Angeles. Offices for the finance and discount companies were on the ground floor at number 1747, while next door at 1749 was the office of one Handley, resident accountant for the organization. Handley was named defendant in this action, but won an acquittal. Colby Collection Agency records were found at both addresses. The upstairs of the building is a large loft—room or hall unoccupied except for one end where a large-scale "phone spot" bookmaking enterprise was conducted with telephones, tables, betting marker racks and the usual paraphernalia for

recording wagers on horse races. Access to the loft was gained from a separate entrance at 1747½.

The telephones there were listed on telephone company applications in the fictitious names of a number of firms ranging from a cabinet maker to one "Stone's Service Station"; but these numbers were listed in the records of the bookmaking organization.

Appellants Kobey, Cobert, Harry Kogus and Albert Kogus were the four principals in the organization, being partners in both the discount company and collection agency. Kobey and Cobert were president and secretary respectively of the Guarantee Finance Company.

The enterprise had in its employ a number of men and women whose duties consisted of recording wagers telephoned to any of a number of so-called "phone spots" located throughout the county. Also affiliated with the organization were some 118 "agents" who operated throughout Los Angeles County. Included among them were appellants Conn, Kletnick and Buford. The latter were on a quasi-partnership basis with the organization, soliciting wagers from the public and sharing profits and losses on a 50-50 basis with the central group. The agents were furnished telephone numbers by the company which they in turn passed on to their customers. By the use of a number so supplied the customer called in to the agent his wagers on horses running on the various race tracks throughout the United States. The usual procedure was for the bettor to place his wager on a particular steed, identifying himself by a first name or nickname and identifying his agent by his first name or a given symbol.

Detailed records of the betting were kept at the headquarters of the group where a daily and weekly accounting was made with the agents who then paid off winning customers or, as was more often the case, collected the wagers from the losers. Customers who became in arrears on their accounts were taken to Guarantee Finance Company where a loan was conveniently arranged. However, the funds loaned were immediately transferred to the discount company and the agent's account credited conditionally.

## The Testimony

There was no want of evidence to warrant the conviction of appellants. The industry and intelligence of the district attorney and the other law-enforcing agencies examined every avenue leading to the heart of the "organization."

1. The first group of witnesses consisted of representatives of the Division of Corporations who made the initial investigation of the finance company's operations at its office on Florence Avenue on January 27, 1949. Voluminous records revealing the bookmaking activities of the several entities of the group were discovered, segregated and later seized under subpoena from the Governor's Crime Commission.

The witnesses identified the numerous documents discovered at both ground floor addresses, testified as to admissions made by the accountant Handley that his employer was a large bookmaking organization, related the admission of Kobey and Cobert as to their own bookmaking activities, and told of their offer to surrender their personal property broker's license on condition that the investigation be discontinued.

One investigator testified as to the unusually small number of loans handled by the finance firm, and that of these loans a large number were unsecured or wage assignment transactions. The excess of the number of loans without security and of those secured by assignments of wages was so suspicious as to create the atmosphere of a criminal enterprise.

2. Members of the vice squad of the Los Angeles Police Department, qualified as experts, identified much of the seized material as being paraphernalia commonly used by bookmakers in Los Angeles. Also, they established that betting markers and detailed records of wagers on horses then racing throughout the country were in common use by men or groups of men engaged in bookmaking. Some of these same police officers testified to their having previously visited the upstairs telephone spot, of having gained access thereto through a rear window which was subsequently barred by the occupants. Police Lieutenant Fisk gave his opinion that the bookmaking industry was in full swing at the time of his investigation which opinion he based upon the presence of telephones, betting markers and numerous worksheets in the loft at 1747½. He testified also that he later had a meeting with appellant Kobey at which time the latter admitted being engaged in bookmaking. Police Lieutenant Wellpott also testified to a meeting with Kobey and to similar admissions.

3. Two other police officers testified to their having apprehended defendant Himebaugh one night in Los Angeles and that he was then in possession of a quantity of bookmaking materials. Appellant Kobey later communicated with Lieutenant Wellpott and sought to recover possession of this paraphernalia.

4. Another group of important witnesses consisted of former employees of the organization. All of them had worked at the various "phone spots" and testified as to the *modus operandi* of the enterprise in receiving and recording wagers, how they had been hired by one of the principals of the organization and how often they had seen one or more of the appellants in and about the phone locations, how they had been paid their weekly salaries in cash and that the Colby Collection Agency was their listed employer who would furnish them withholding-tax statements.

5. A number of former "agents" of the enterprise testified in detail as to their functions in procuring customers to place wagers, as to the procedure used in placing the bets with the central group and of the periodic accounting for profits and losses, and as if to weave about appellants their own winding sheet, one Sackman, their tax consultant, testified as to the income of many of the principals of the enterprise and of certain damning admissions by them.

6. A number of former customers testified concerning their betting transactions with agents of the organization, identified appellants Kletnick, Conn and Buford as their particular agents and related incidents and circumstances of such nature as to identify these men as instrumentalities of Guarantee Finance Company. They detailed also the procedure followed in obtaining loans from Guarantee to pay off gambling debts incurred.

7. A telephone company official testified as to the applications of appellants for listings of telephones at the Florence Avenue address. The witness Charles H. Manaugh, accountant for the Crime Commission had made an examination and analysis of the books and records seized at the Florence Avenue headquarters. He traced a transaction involving a loan to a customer who had been unable to pay his gambling losses. He testified also that the business of the bookmaking organization and that of Guarantee Discount Company were substantially the same. His disclosures with regard to protection pay-offs will constitute an illuminating page in this discussion.

Without unduly extending this report of a shocking chapter of a vice-protected rendezvous, suffice it to say that an abundance of evidence establishes that all of the appellants were parties to a grand-scale bookmaking conspiracy. It can hardly be seriously contended otherwise when there is virtually no conflict in the record inasmuch as appellants offered no witnesses in their behalf and not one of them ventured to testify

on behalf of himself or his associates or to challenge the testimony of a state witness. However, they do contend that any evidence establishing a conspiracy was supplied only by testimony of those who had served as agents of the organization and that they were accomplices whose testimony was not corroborated.

## Ample Corroboration

■ Such contention is archaic. Under Penal Code, section 1111, the corroborating evidence need only tend in some slight degree to implicate the defendants. ■ Circumstantial evidence suffices for this purpose. ■ Proof of the relationship of the parties, their conduct and statements during and after the crime is competent and if the jury finds that such facts indicate the parties' knowledge of the criminal acts while in process—such finding will suffice to corroborate accomplices. (*People* v. *Griffin*, 98 Cal.App.2d 1, 24, 26 [219 P.2d 519], and authorities there cited.) ■ Such evidence is sufficient if it tends only slightly to implicate the accused and where it is inculpatory it is not essential that it extend to every detail related by the accomplices. (*Ibid.*)

■ The corroborative proof in support of the "agents" was ample. The witness Pearce, Assistant Commissioner of Corporations, related that Kobey and Cobert told him: "We are bookmaking. You have got the dope. You caught us with our books all mixed up and what is the use of going on with the hearing?" He also testified that in the presence of the four principal appellants, Sackman told them they were foolish because he warned them not to mix their other business with that of the finance company; that they were caught and now they were crying over spilt milk. At the hearing conducted by Mr. Pearce, despite the accusations that the group were bookmaking, not one denial came from any appellant. Moreover, the presence of the records and equipment identified as bookmaking paraphernalia supplied additional corroborative evidence. ■ These records were found at appellants' place of business and were admissible against all defendants. (*People* v. *Steccone*, 36 Cal.2d 234, 240 [223 P.2d 17].) ■ The fact that Mr. Handley, in whose immediate possession they were found, was acquitted of conspiracy charges does not alter the force of such company records as proof against his principals. (*People* v. *Ross*, 100 Cal.App.2d 116, 121 [223 P.2d 85].) Concerning his preparation of the partners' tax reports Sackman testified that he told his clients that he needed facts and figures as to their income in order

to complete proper tax returns. They replied that such figures could not then be procured because "their books and records" were in the custody of law enforcement officers. The records were properly received in evidence as another link in the chain tending to prove appellants' participation in the conspiracy. (*People* v. *Steccone, supra,* 239.)

### SUFFICIENCY OF THE EVIDENCE

■ Appellants contend that there is "no evidence on which the convictions of Himebaugh, Conn, Kletnick and Buford can stand." In view of the evidence given above where it is shown that (1) no appellant ever denied that he was engaged in bookmaking when accused and (2) none of them denied his connection with the organization, it cannot reasonably be held that the evidence was insufficient. (*People* ·v. *Kelley,* 22 Cal.2d 169, 176 [137 P.2d 1]; *People* v. *Allen,* 22 Cal.2d 191, 192 [137 P.2d 439].) The facts impliedly found and recited in the statement of the case place the judgment of conviction beyond suspicion. The proof of the arrangement of the several offices of the companies and partnerships, of the telephones, scratch sheets and other paraphernalia commonly used only by bookmakers render it inappropriate to doubt the veracity of those appellants who admitted they were bookmakers. The circumstances established, the admissions made and a total lack of evidence on behalf of appellants were sufficient to justify the judgments. (See *People* v. *Jerman,* 29 Cal.2d 189, 196 [173 P.2d 805]; *People* v. *Warnick,* 86 Cal.App.2d 900, 902 [195 P.2d 552] and authorities there cited. ■ The fact that they maintained and occupied an enclosure with paraphernalia used for recording bets on horse races is sufficient without the necessity of showing a race was actually run. (*People* v. *Hinkle,* 64 Cal.App. 375, 380 [221 P. 693]; *People* v. *Vertlieb,* 22 Cal.2d 193, 197 [137 P.2d 437].)

### TESTIMONY OF MANAUGH

■ It is contended that the court prejudiced appellants in denying their motion to strike the testimony of the witness Manaugh relative to an item of $108,985 labeled "special" appearing in appellants' records of cash disbursements for the year 1948. The witness was a lawyer and a trained accountant. For him to testify to the significance of bookkeeping terms in current use was in accord with customary practice and with the rules of admissibility. The same amount

appeared on a weekly disbursement record under the designation "JC."

Basing his testimony on the assumption that the defendants had been operating a bookmaking concern the witness was permitted to testify that in his opinion this item represented a cash outlay disbursed in 1948 for protection from law enforcement officers. He based his opinion upon his own examination of the accounting records of the organization which indicated that these were cash disbursements charged to a special account labeled "JC"—a label which could well stand for "juice," a term used to signify money paid for protection or pay-off. He testified further as to the basis of his opinion that these sums were distributed weekly in varied uneven amounts and that a portion of the expense appeared to be allocated back to the agents. He related also that he found entries entitled "juice account," "shake down," "hold-up," "take," and "pay." The sum of $108,985 was the only amount charged as an expense of this bookmaking enterprise in 1949 and the sum had been carried forward from 1948. While the witness could not tell from the records exactly which persons had received the money, yet the fact of its disbursement under the mysterious accounts is a circumstance indicative of the criminal nature of the group and its activities and its consciousness of a necessity to harbor in secrecy the actual destination of the "juice" moneys. The very presence of the phrase "shake down" reveals the horror of the penman who was required to record the payments of the sums constituting the fortune which was disbursed for protection. The bookkeeper could have had no motive for inscribing such winged words into the glum records of a bookie house other than to have a record of moneys disbursed to nameless recipients who had served his outlaw employers.

There is no surmise or conjecture in the opinion of the witness. Every circumstance that contributed to his opinion was detailed to the jury and the latter were in possession of all the facts which enabled them to determine the correctness of his opinion. Of such matters they could judge for themselves just as in the case of a nonexpert's opinion that an accused person on trial is insane. The opinion serves as a guide while the verdict must be founded upon the facts recited by the witness. The jury was helped by the opinion by reason of the magnitude of the unusual scheme and plan of the company and of its far-reaching operations. His experience in inspecting the books of sundry concerns had acquainted him

with the widespread use of bookkeeping terms commonly used to conceal the identity of payees.

If his testimony had not been true, it would have been a simple matter for the man who made the entries to explain them or for appellants to have denied the correctness of his observations. They knew the facts better than one who had merely read their accounts. (*People* v. *Steccone, supra*; *People* v. *Adamson,* 27 Cal.2d 478, 490, 491 [165 P.2d 3].) Moreover, in its charge the court advised the jury that they were not bound to accept the opinion of any expert, but only to give to it such weight as that to which they deemed it to be entitled, and to disregard it if they found it unreasonable. The jury is presumed to have followed the court's advice and to have exercised its discretion soundly. (*People* v. *Letourneau,* 34 Cal.2d 478, 494 [211 P.2d 865]; *People* v. *Horiuchi,* 114 Cal. App. 415, 436 [300 P. 457]; *People* v. *Ferlin,* 203 Cal. 587, 600 [265 P. 230].)

But conceding, *arguendo,* that there was error in the court's denial of the motion to strike Manaugh's testimony, it was not prejudicial. In view of the enormous volume of evidence received on behalf of the prosecution, of the practical confessions of the chief actors, and the failure of every appellant to mount the witness stand, how could the interpretation by an experienced accountant have misled a juror? Since no other verdict than that of guilty could have been returned, the court's refusal to strike the Manaugh testimony could not reasonably justify a reversal of the judgment. (*People* v. *Simmons,* 28 Cal.2d 699, 720 [172 P.2d 18]; Constitution, art. VI, § 4½.)

### DISCHARGE OF ONE JUROR

▄▄▄ Appellants assign as prejudicial error the refusal of the trial court to discharge the jury after they had been sworn "and upon the removal of one of the regular jurors." They have no justifiable basis for such assignment. The facts are that on March 6, 1950, 12 regular jurors were sworn to try the cause. The proceedings to select alternate jurors continued through March 8. On that day the court discovered that juror number nine had not disclosed "the existence of a state of mind . . . which would preclude her from trying the case with absolute impartiality." No alternate juror had yet taken oath to serve. Thereupon, all counsel stipulated that another venireman be called and examined as to his qualifications. Juror nine was then excused without protest and Mrs. Goodwin was subjected to the customary inquiry. She

satisfied all parties and was on the same day sworn in as a member of the regular panel. With all parties cooperating, the selection of alternates was thereafter duly consummated.

Appellants now contend that it was the court's duty to discharge the entire jury and empanel an entirely new one, citing section 1123 of the Penal Code.[1] There is no evidence of a violation of the cited statute. But if there were, the parties had the right to agree upon the persons who would constitute their jury. This is exactly what appellants did through their attorneys who stipulated to the discharge of juror nine and actually examined and accepted her successor. ▉▉ The attorney had authority to stipulate to steps in the procedure of a criminal case (*People* v. *Hanna*, 36 Cal.App.2d 333, 336 [97 P.2d 847]) and on appeal the "defendant may not assert procedural rights which he waived at the trial." (*People* v. *Wilson*, 78 Cal.App.2d 108, 120 [177 P.2d 567].) So if it were error, appellants as authors of the stipulation cannot be heard to complain of what they caused the court to do. (*Jackson* v. *Superior Court*, 10 Cal.2d 350, 358 [74 P.2d 243, 113 A.L.R. 1422].) Their claim that their stipulation extended only to the removal of juror nine is an unreasonable argument in the light of the record. How could they contend so after participating in the examination of Mrs. Goodwin and accepting her? ▉ It is a general rule whose repetition seems often to be required: Before a party may successfully take advantage of the behavior of the trial court, he must have objected, protested and assigned the conduct as prejudicial in order that the court may correct the asserted error. Appellants' contention does not come within any exception to that rule.

## INSTRUCTION 933 IS NOT ERROR

▉ In a lengthy charge covering every phase of the issues created by the indictment and appellants' plea, the court included the following approved instruction taken from CALJIC. ("California Jury Instructions, Criminal.")

---

[1]Penal Code, section 1123. "If before the jury has returned its verdict into court, a juror becomes sick or upon other good cause shown to the court is found to be unable to perform his duty, the court may order him to be discharged. If any alternate jurors have been selected as provided by law, one of them shall then be designated by the court to take the place of the juror so discharged. If, after all alternate jurors have been made regular jurors or if there be no alternate juror, a juror becomes sick or otherwise unable to perform his duty and has been discharged by the court as provided herein, the jury shall be discharged and a new jury then or afterwards impaneled, and the cause may be again tried."

"The formation and existence of a criminal conspiracy belong to a class of facts which seldom can be established by direct evidence. In the very nature of the case, such common design rarely can be shown by direct evidence, and often can be shown only by circumstantial evidence. A finding of the formation and existence of a conspiracy may stand upon circumstantial evidence alone, if from all the evidence the jury is convinced beyond a reasonable doubt of the existence of such facts. In determining the question whether or not an alleged conspiracy was formed and existed, it is proper to take into consideration the relation of the accused parties to one another, if the evidence shows any connection between them, their personal and business associations with each other, if any, and any and all facts in evidence which may tend to show what, if anything, occurred between them at or before the time of the alleged combination or agreement, or which tend to show what, if anything, occurred between them, or any of them, thereafter in relation thereto, as well *as evidence of any acts performed and declarations made by any of said parties subsequent to the formation of such alleged combination or agreement and in respect to, and in pursuance and furtherance of, the alleged conspiracy.* From such facts and circumstances as shown by the evidence, you will determine whether or not a criminal combination or agreement did in fact exist, as charged in the case, and if it did exist, which, if any, of the defendants were parties to such conspiracy."

Appellants complain of the italicized portion and contend that the jury were thus told that in determining whether or not a conspiracy existed as alleged in the indictment they could take into consideration some 68 overt acts set forth in the indictment as having been done in pursuance of the conspiracy and to effect its objects and purposes. It is argued that (1) under this instruction the jury could find the existence of a conspiracy from the overt acts, and (2) this is erroneous inasmuch as there can be no overt act (something done in pursuance of the conspiracy or to effect its object) until after the conspiracy itself is established, citing *United States* v. *Goldberg*, 25 F. 223. However, there is no error in the instruction, prejudicial or otherwise, when read in its entirety and in the light of the entire charge. (*People* v. *Frazier*, 88 Cal.App.2d 99, 105 [198 P.2d 325].) The theme of the instruction related to proof of conspiracy by means of circumstantial evidence, that the jury could consider what occurred "at or before" or "subsequent" to the formation of the con-

spiratorial agreement to determine whether in fact it did exist.　　It is true that no agreement amounts to an actionable conspiracy unless an overt act is alleged and proved but this does not preclude the jury from considering acts subsequent to the agreement in arriving at the defendants' intent. (*People* v. *Torres*, 84 Cal.App.2d 787, 794 [192 P.2d 45]; *People* v. *Daener*, 96 Cal.App.2d 827, 831 [216 P.2d 511].)

Virtually the only method by which a conspiracy can be proved is by circumstantial evidence—the actions of the parties as they bear upon the common design. It is not necessary to show directly that the parties actually closeted themselves, attained the proverbial meeting of the minds and agreed to undertake the unlawful acts. (*People* v. *Steccone, supra,* 36 Cal.2d 234, 238.) It is a familiar principle of the law that in deriving whether an agreement was unlawful the triers of the fact may consider the events that occurred ''at or before'' or ''subsequent'' to the formation of the agreement. From the proof of the occurrences beforehand and at the time of the agreement linked with evidence of the overt acts a jury may determine that a criminal conspiracy was formed. (*People* v. *Daener, supra*; *People* v. *Torres, supra*.) The major portion of the evidence might consist of the conversations and writings of the conspirators or it may consist of the overt acts done pursuant to the conspiracy. Such acts may establish the purpose and intent of the conspiracy and relate back to the agreement whose purpose may be otherwise enshrouded in the hush-hush admonitions of the conspirators. Whatever be the order of proof the jury has finally to determine whether the alleged conspiracy has been established. (*People* v. *Steccone, supra*.)

There was nothing in instruction 933 to mislead the jury. They were told that no agreement becomes a conspiracy unless ''at least'' one of the criminal acts agreed on be alleged and proved. From that instruction aided by the general charge the jury necessarily understood that they could not convict appellants unless an overt act was done to effect the object of the conspiracy. Viewed as a minute part of the instructions to the jury, there was no prejudice caused by CALJIC'S 933.

　　No error resulted from an alleged conflict of 933 with CALJIC'S 935 which advised the jury that no act or declaration of any conspirator shall bind another until a conspiracy has been proved to have existed at the time of the declaration and no defendant shall be responsible for the act of an ''alleged conspirator when the only substantial evidence of an

agreement between them is evidence of the acts and declarations of the latter."

Because at appellants' request the court gave the same instruction, no possible error could obtain in that given for the People. Since any single instruction can be considered only in connection with all others (*People* v. *Tolmachoff*, 58 Cal. App.2d 815, 825 [138 P.2d 61]) it is clear that no error flowed from 935 or from its asserted conflict with 933. The jury could not have been misled by the contents of either because they were directed to consider and construe each instruction with all the others. (*People* v. *Jordan*, 24 Cal.App.2d 39, 54 [74 P.2d 519].) Viewing the two cited instructions in connection with the evidence and the entire charge "the verdict cannot reasonably be deemed to have been the result of a misconception of the law." (*People* v. *Honeycutt*, 29 Cal.2d 52, 62 [172 P.2d 698].)

INSTRUCTION ON BOOKMAKING

The court gave the following instruction: "You are instructed that the term 'bookmaking' as used in the indictment means the making of a betting book and includes the taking and receiving of bets and wagers; the recording and registering of bets and wagers; and the keeping and occupying of any room and building with books and papers, devices and paraphernalia for the purpose of registering and recording bets and wagers upon the results or purported results of any trial or purported trial or contest or purported contest of skill, speed and power of endurance of beasts, to wit, horses." Appellants assign it as error.

Such instruction is fully in accord with the law as enacted by the Legislature. No authority would approve of any interpretation of the cited section contrary to that contained in the instruction. (*People* v. *Wilson*, 78 Cal.App.2d 108, 113 [177 P.2d 567].) Appellants' comment that the jury were told that "appellants were charged with conspiring to commit not one but five separate offenses," does not accord with the impression gained by a disinterested party. As seen from this distance the court's charge sounds verily like the parties at the bar were on trial for having performed a criminal conspiracy to violate the bookmaking statute. The jury thought so as indicated by their verdicts, convicting them as charged. The trial judge thought so as indicated by his rulings, his denial of the motion for a new trial and by the punishment meted out to appellants. To do all the things speci-

fied in all five subdivisions of section 182 of the Penal Code (defining criminal conspiracy) "amounts to a single offense." (*People* v. *Gilbert,* 26 Cal.App.2d 1, 7 [78 P.2d 770].) The conspiracy inhibited by the cited section is a single offense, howsoever diverse its objects. The gist of the crime is the conspiracy and it is single although its object be several crimes. (*People* v. *Yant,* 26 Cal.App.2d 725, 729 [80 P.2d 506].) Thus, the contention of appellants goes wide of the mark: the question of distinct and separate offenses is not involved.

Appellants complain that notwithstanding its duty to do so the court did not charge the jury fully and fairly upon the law relating to the facts of the case. They do not read the record as it is found by this court. Appellants were accused of effecting a conspiracy "to engage in pool selling and bookmaking with and without writing." They say that the jury should have been advised "as to the specific charge against appellants so that they could properly apply the law with reference to those charges to the facts shown by the evidence." The jury were so advised. The foregoing discussion of the instructions shows that the crime charged was conspiracy, the overt acts alleged and proved demonstrated to the idle spectator that appellants were on trial for a conspiracy to engage in bookmaking and the contentions of appellants throughout indicate their awareness of the crime charged. Nothing in the instruction quoted above justifies the statement that such instruction charged a conspiracy to violate subdivisions 2, 3, 4 and 6 in addition to subdivision 1 of section 337a. The indictment attempted to do no more than to charge a conspiracy to violate subdivision 1 which makes it a crime to engage "in pool-selling or book-making, with or without writing." After alleging a conspiracy to violate section 337a, the pleading proceeds to enumerate 69 overt acts. Each act alleges the occupancy by defendants of specified rooms with books and paraphernalia for registering bets on horse races, their recording and registering bets, their installation of telephones for receiving bets, their furnishing betting markers, pencils and scratch sheets to their employees, the employment of sundry persons to assist in such receiving and recording, or their loans to different persons for the purpose of discharging debts incurred in wagers on horse races and divers other acts, all having to do with the business of bookmaking.

But aside from the indictment, the instruction was a correct statement of the law as applied to the facts proved. A con-

spiracy was alleged and the instruction aptly and clearly defined the meaning of bookmaking. To define bookmaking as only "the making of a book of bets" as appellants contend it should be is not sufficiently definitive to be of any aid to a jury. The fact that the term "bookmaking" used in subdivision 1 of 337a necessarily overlaps in some degree the offenses proscribed by the other subdivisions does not nullify or disparage the offense specified in subdivision 1. Bookmaking on horse races necessarily includes the receiving and recording of bets on the results of races and implies the use of some method for recording wagers. (*People* v. *Jerman*, 29 Cal.2d 189, 199 [173 P.2d 805] ; *City of Portland* v. *Duntley*, 185 Ore. 365 [203 P.2d 640, 644].)

Appellants assign as error that the jury were not advised as to the specific charge against them. Not only does the voluminous charge defeat the assignment by its definitions of bookmaking, conspiracy and overt acts as well as the kind, quality and degree of proof required, but the indictment with its full and complete statement of the accusation of a criminal conspiracy to violate section 337a was generous advice as to the crime charged. Furthermore, throughout the trial on innumerable occasions, it was stated in the presence of the jury: "They are charged with a conspiracy to violate bookmaking laws." Consequently, it cannot be held that appellants suffered any prejudice by reason of the jury's lack of knowledge of the offense charged.

The judgments and the order denying the motion for a new trial are affirmed.

McComb, J., and Wilson, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied August 16, 1951. Peters, P. J., and Goodell, J., sitting in place of Shenk, J., and Spence, J. Carter, J., and Schauer, J., voted for a hearing.